Consuelo Pratt BERNARD,
Plaintiff-Appellant,

v.

CESSNA AIRCRAFT CORPORATION,
Defendant-Appellee.

Consuelo Pratt BERNARD,
Plaintiff-Appellant,

v.

Raymond L. SHEPPARD,
Defendant-Appellee.

Consuelo Pratt BERNARD,
Plaintiff-Appellant,

v.

CESSNA AIRCRAFT CORPORATION,
Defendant-Appellee.

No. 79–2133
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

April 4, 1980.

---

\* Fed.R.App.P. 34(a); 5th Cir. R. 18.

Darryl J. Tschirn, John M. Robin, Covington, La., for plaintiff-appellant.

Christovich & Kearney, A. R. Christovich, Jr., New Orleans, La., for Cessna Aircraft Corp.

Chaffe, McCall, Phillips, Toler & Sarpy, Jarrell E. Godfrey, Jr., New Orleans, La., for Raymond L. Sheppard.

Before AINSWORTH, GODBOLD and FAY, Circuit Judges.

GODBOLD, Circuit Judge.

This is a civil action for damages for wrongful death, tried under the Louisiana law. At the end of the evidence the district judge granted a directed verdict for the defendants.

The case arises from the mid-air collision of two small aircraft at the Acadiana Regional Airport, New Iberia, Louisiana. A Cessna 177 plane was occupied solely by decedent Bernard, a pilot with 23 hours flight time, 6.7 hours of this dual time in the 177. At the time of collision he was flying the 177 solo for the first time. The other plane, a Cessna 150, was occupied by defendant Sheppard, a pilot with 50 hours time, and a passenger. The airport was uncontrolled, having neither a tower nor radar control. The collision occurred during the daytime in conditions of good visibility.

Both planes had been making "touch-and-go" practice landings. A plane doing this was supposed, after each touch down (made upwind), to take off and follow a rectangular traffic pattern: i. e., after take-off turn left (crosswind), left again (downwind and parallel to the landing strip), left again (crosswind) and left again (upwind) on the final leg. On the final leg the plane would be approaching the runway for another touch down.

Sheppard had flown to New Iberia from the airport at nearby Lafayette, Louisiana. When he first entered the traffic pattern, traveling downwind and parallel to the runway, he saw another Cessna on the runway beginning to take off. He completed three to four touch-and-go landings before the flight on which the collision occurred. Sheppard testified that on each one of these, as he went downwind, he saw another Cessna taking off or landing on the upwind leg. As he made his last circuit he saw a high wing Cessna taking off.

Whether the plane or planes he saw in these circuits, and the Cessna he saw on the ground when he first came into the traffic pattern, was the Bernard plane or a third Cessna that was around the airport part of the time, Sheppard did not know.

Bernard had made five to eight touch-and-go landings accompanied by his instructor. He dropped his instructor at the hangar. A few minutes later the instructor saw Bernard taking off. This was the last time that Bernard's plane was seen by anyone until after the collision occurred.

When the collision took place Sheppard was on the final (upwind) leg of his landing pattern and had been for 15 to 45 seconds. He had descended to about 300 feet altitude. Sheppard and his passenger testified that a plane, later found to be the Bernard plane, struck them from behind. Expert witnesses testified that the Sheppard plane was struck from behind. After the collision the Sheppard plane was able to land safely. The Bernard plane crashed and Bernard was killed.

The Cessna 150, piloted by Sheppard, was smaller and less powerful and had a landing speed of 60 to 70 miles per hour. The Cessna 177, piloted by Bernard, was larger and more powerful and had a landing speed of 70 to 80 miles per hour.

Bernard's widow brought this suit alleging negligence against Sheppard and negligent design and strict liability against Cessna. We review the directed verdict under the standards of *Boeing v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (en banc).[1]

■ Plaintiff asserts that she was entitled to submit her case against Sheppard to the jury on any one of three theories of negligence. (1) When Sheppard first arrived in the vicinity of the Acadiana Airport he should have entered the traffic pattern on the downwind leg, parallel to the airstrip, but the jury could have accepted the testimony of his passenger that instead he circled the airport before entering the

traffic pattern. (2) There was evidence from which the jury could infer that Sheppard failed to attempt to transmit his landing plans, as he was supposed to do during each circuit in the traffic pattern, or failed to insure that the radio in his plane was transmitting on the frequency on which, at uncontrolled airports, such announcements were required to be made. (3) As Sheppard made his way around the traffic pattern on the circuit during which the collision occurred he flew a longer downwind leg than on earlier circuits and failed to announce by radio that he was doing so. Plaintiff contends that the jury was entitled to infer from this that Sheppard's flying this longer leg permitted Bernard's plane more time to take off and catch up with Sheppard's craft than it would have had if Sheppard had flown a downwind leg of the same length as in each previous circuit.

The difficulty with all these theories is that there is no evidence supporting any causal connection between any one of them and the accident. It is purely speculative whether the absence of radio transmissions, if they did not occur, or the length of Sheppard's last downwind leg had any relation to the collision. No one knows what happened to the Bernard plane between the time the instructor who had dismounted and gone into the hangar, saw Bernard beginning to take off on his first solo flight. There is no evidence what route he followed from take-off to the point of impact, whether he adhered to the traffic pattern or flew in some other direction to the point of impact, or at what altitude he traveled. There was testimony indicating that possibly Bernard flew to a practice area near the airport and then came back to the strip. What the Bernard plane did from the last sighting of it until the time of collision is an unknown, embracing possibilities that we have suggested and others as well, all speculative. With respect to the first theory of negligence, circling the airport before entering the traffic pattern, this occurred long before the collision and was separated

---

1. Our review is facilitated by the district judge's written statment of reasons for granting the directed verdict.

from it by many intervening events. There is no substantial evidence to support any inference that any action or failure to act by Sheppard caused or contributed to the collision.

 The claim against Cessna charging negligence in manufacture, design and testing is based upon a theory that the Sheppard plane should have had a "window" or "sun roof" that would have permitted the pilot to see above and behind his plane, thus eliminating a blind spot, and the Bernard plane should have had a similar opening in its floor through which its pilot could see below and in front of his craft. There was testimony that other small planes, including some Cessnas, have a "sun roof" that adds to visibility above and behind. However, as with the negligence claims against Sheppard, there is not substantial evidence that this caused or contributed to the collision. Sheppard was on his final leg, descending to land, and at approximately 300 feet. He had been on the final leg for 15 to 45 seconds. There is no substantial evidence suggesting that a pilot in such circumstances, engaged in the mechanics of landing, would or should anticipate the possibility that in violation of the "rules of the road" for aircraft another plane might be coming down on him from behind and above, and therefore would or should keep a lookout, or even glance, to the rear rather than devote his full attention to the front and below, where his descending plane is headed.

There is no substantial evidence supporting the theory that the Bernard plane should have had a "see through" opening in its floor.

In strict liability cases Louisiana follows a two-tier analysis. First, plaintiff must show that the product was in normal use and was unreasonably dangerous in that use, and, second, that his injuries were caused by the defect. *Perez v. Ford Motor Company*, 497 F.2d 82, 86 (5th Cir. 1974). Pretermitting the argument over sufficiency of proof of normal use, for the reasons we have given in dismissing the negligence claims, plaintiff has not introduced sufficient evidence to make a jury issue of whether the collision was caused by a defective product.

The district court did not err in granting the directed verdict for defendants.

AFFIRMED.