NICHOLS CONSTRUCTION CORP., Plaintiff-Appellant,

v.

CESSNA AIRCRAFT CO., et al., Defendants-Appellees.

No. 83-3187.

United States Court of Appeals, Fifth Circuit.

Nov. 8, 1985.

Rehearing Denied Dec. 24, 1986.

McGlinchey, Stafford, Mintz, Cellini & Lang, Dermot S. McGlinchey, William V. Dalferes, Jr., New Orleans, La., for plaintiff-appellant.

Christovich & Kearney, A.R. Christovich, Jr., New Orleans, La., for Cessna Aircraft.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Donald O. Collins, New Orleans, La., John W. Adler, Franklin A. Nachman, Chicago, Ill., for Garrett.

Charles R. Sonnier, Abbeville, La., for Cruse Aviation.

Before CLARK, Chief Judge, and GARWOOD and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge.

Nichols Construction Corporation, plaintiff-appellant in this Louisiana diversity action to recover the value of an allegedly defective airplane, appeals from the district court's grant of judgment notwithstanding the verdict in favor of defendants-appellees Cessna Aircraft Company and Garrett Corporation and of directed verdict in favor of defendant-appellee Cruse Aviation, Inc.

Finding that the evidence is insufficient to support a verdict for the plaintiff, we affirm.

### Facts and Proceedings Below

Appellant Nichols Construction Corporation ("Nichols") sought to recover the value of its Conquest Model 441 aircraft which crashed under mysterious circumstances in the Atlantic Ocean, killing both the pilot and Louisiana State University football coach Robert "Bo" Rein.

Cessna Aircraft Company ("Cessna") manufactured the Conquest 441, a twin-engined, turboprop aircraft which could carry between seven and nine passengers and was certified by the Federal Aviation Administration ("FAA") to fly at heights up to 33,000 feet. The Conquest aircraft contained outflow and safety valves which were designed to regulate cabin pressure during flight. The aircraft was constructed so that the engines supplied a continuous flow of pressurized air into the cabin and cockpit; the outflow valve, in turn, either opened or closed to release or retain the compressed air as necessary to maintain cabin pressure at a safe level. In the event the outflow valve were to malfunction and remain in a closed position, creating overpressurization, the safety valve would begin to operate as a backup system to release pressure.[1] The aircraft did not contain a similar backup mechanism for outflow valves that locked in an open position. Both the outflow and safety valves contained a diaphragm retention ring made of lexan, a material similar to plastic.[2] The valves and the rings were manufactured by Garrett Corporation ("Garrett").

In April 1979, Nichols purchased the new Conquest 441 through an authorized Cessna dealer, Cruse Aviation, Inc. ("Cruse"), for $961,700. Garrett subsequently sent a series of teletype Service Bulletins to Cessna, advising it of a "potential problem" in diaphragm retention rings of the type used in the Conquest 441. The last Service Bulletin, dated December 15, 1979, stated:

> "The problem area is centered around the balance diaphragm retention ring cracking and breaking away from the diaphragm assembly. *If* this occurs, the valve will close and *may* not perform its normal pressure relief and depressurization functions." (Emphasis added.)

Garrett advised Cessna to warn aircraft owners to visually inspect the rings, following a procedure outlined by Garrett in the Service Bulletin. After receiving this notice, Cessna sent out a "Customer Care Owner Advisory" on December 21, 1979, advising owners of Cessna-manufactured aircraft that contained this type of retention ring to contact their Cessna dealers in order to arrange to have the safety and outflow valves inspected. Nichols received a copy of this notice.

Nichols thereafter had its pilot, Lewis Benscotter, fly its Conquest 441 to Houston on January 10, 1980, where Cruse conducted an inspection. At the time of inspection, the aircraft had registered be-

---

**1.** When an airplane overpressurizes, the potential exists for the aircraft to sustain structural damage as compressed air in the interior of the airplane pushes outward against the walls with greater force than the structure was designed to withstand. The aircraft could develop leaks or an outright blowout of a window or door, ultimately causing the aircraft to become underpressurized. As the aircraft loses pressure, the amount of oxygen present in the aircraft also decreases. If the pressure drops too low, the potential exists for occupants of the aircraft to develop hypoxia and become incapacitated.

At the start of the flight, the pilot is supposed to select the pressure level that the aircraft is to maintain during the flight. If pressure inside the airplane increases above the level selected, the outflow valve is designed to open automatically to allow the excess compressed air to escape. If pressure drops below the selected level, the outflow valve is designed to automatically close until the compressed air drawn in by the engines brings the cabin pressure up to the desired level. The safety valve is designed to remain closed unless cabin pressure continues to climb beyond the level selected; at a certain point, the safety valve will automatically open to release compressed air. The safety valve was also designed to open when the cabin pressurization switch was positioned on "depressurize."

**2.** The ring helps fasten the diaphragm to the poppet valve, the portion of the outflow valve that actually opens and closes to release or retain compressed air.

tween fifty and sixty-five hours of flight time. It is conceded that the Cruse mechanic, Richard Bockelman, conducted a more thorough inspection of the valves than that outlined in Garrett's Service Bulletin.[3] He then ran pressurization tests, in which the valves functioned properly. After Bockelman completed the inspection of the valves and pressurization tests, Benscotter flew to Shreveport and picked up Rein. They then departed for Baton Rouge. Rather than fly directly from Shreveport to Baton Rouge, Benscotter was advised by air traffic controllers to fly east to Monroe, Louisiana, southeast to Vicksburg, Mississippi, and then south to Baton Rouge, in order to avoid inclement weather. Benscotter acknowledged the controllers' message.

Initially, air traffic controllers were able to communicate with Benscotter as the Conquest 441 headed east from Shreveport toward Monroe. Later in the flight, however, controllers from the Fort Worth Center tried unsuccessfully to get through to him after he exceeded a 25,000-foot altitude clearance level which had been imposed on this flight because of the weather.[4] The controllers contacted an airborne Pan American airplane which was flying in the vicinity of the Conquest 441, headed for Houston, and asked the pilot to contact the aircraft. The Pan Am pilot, William Kianka, initially tried, without success, to contact Benscotter on the assigned frequency. He subsequently managed to contact the Conquest over the emergency frequency and relayed the message that Benscotter was to contact the Center. Kianka testified that Benscotter had acknowledged his message and could be heard trying to contact air traffic control. Kianka also testi-

fied, however, that he could barely hear Benscotter's attempts to contact Fort Worth on the assigned frequency, and Fort Worth was unable to pick up his radio contact at all. When asked whether he "detect[ed] anything unusual about the tone of voice or the quality of voice," Kianka responded, "No, not anything whatsoever different." Kianka explained that Benscotter's "voice wasn't weak," but that his radio transmissions were difficult to hear. Kianka subsequently was asked, "Did you in either of those times, the first transmission or the subsequent transmissions, detect anything unusual about the voice itself," to which he replied, "No, not at all." Benscotter's transmissions to Kianka's jet were the last audible contacts picked up from the Conquest.

At about 1:40 a.m. on January 11, the Conquest 441 plunged into the Atlantic Ocean, some eighty miles off the coast of Portsmith, Virginia, killing both occupants. Shortly before the plane crashed, an Air Force jet, acting at the request of the ground control at Fort Lee, Virginia, and at Washington Center, came within about 500 feet of the Conquest. At this point, the Conquest was flying at an altitude of approximately 40,000 feet. The pilot of the Air Force jet, Captain Daniel Zoerb, testified that he did not observe any signs of life in the cabin, but added that "it was impossible to see inside the cockpit." He also testified that the windows and doors appeared to be intact and that the cockpit panel lights appeared to be operating. He noted that the cabin section was dark. The Air Force jet followed the aircraft out to sea. Zoerb observed that the Conquest began to lose altitude, made a right-hand turn, and then appeared to quit functioning

3.  Thomas Lombardo, Nichols' expert witness on the issue whether the inspection procedure would have revealed a defective ring, acknowledged during cross-examination that Bockelman conducted a more rigorous examination of the valve than was specified in the Service Bulletin. Although Lombardo testified that the inspection procedure contained in the Service Bulletin was inadequate, he indicated that he was uncertain how Bockelman went about inspecting the valves. Lombardo testified, "I don't know how he did it. I didn't say he couldn't do it. I'm

saying *if* he inspected in accordance with the bulletin, he could not inspect the retention ring." (Emphasis added.)

4.  The aircraft eventually climbed up to 40,500 feet, in spite of the fact that the FAA had certified the Conquest Model 441 to fly no higher than 33,000 feet at any time. As noted, the Fort Worth Center had imposed a 25,000-foot ceiling on Benscotter's flight due to the weather.

altogether, plummeting into the ocean. No wreckage was ever recovered nor were the victims' bodies ever found.

Nichols brought this diversity action against Cessna and Cruse to recover the value of the Conquest. Garrett subsequently was added as a defendant by amended complaint. Nichols argued alternative theories of negligence against all the defendants,[5] recovery on redhibition against Cessna and Cruse,[6] and products liability against Cessna and Garrett.[7] Nichols theorized that the accident was caused by a broken retention ring or rings which caused the outflow valve, and possibly the safety valve, to jam in an open or closed position. As a consequence, Nichols argued, the aircraft ultimately underpressurized and the occupants succumbed to hypoxia.[8] The case was tried to a jury. At the close of all the evidence, all defendants moved for a directed verdict. The district court denied defendants' motions except the motions for a directed verdict on the redhibition claim, as to which it deferred ruling. The court instructed the jurors on the plaintiff's burden under each of its theories of recovery, including the theory of redhibition. The jury returned a verdict

---

**5.** Under Louisiana law, a plaintiff who wishes to recover under a negligence theory must prove that

"defendants had a duty to observe a certain standard of care toward the [plaintiff] ...; defendants breached this duty by falling below that standard; defendants' breach of this duty *was a cause-in-fact* of the [accident] ...; and the harm which actually occurred was the sort of harm that defendants' legal duty was designed to prevent." *Walker v. Union Oil Mill, Inc.,* 369 So.2d 1043, 1047 (La.1979) (emphasis added).

*See also Buckley v. Exxon Corp.,* 390 So.2d 512, 514 (La.1980) ("[T]he elements of a cause of action [for negligence] are fault, causation and damage."). The statutory bases for Louisiana negligence law are contained in La.Civ.Code Ann. art. 2315A, which provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it," and La.Civ.Code Ann. art. 2316, which provides that "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."

**6.** La.Civ.Code Ann. art. 2520 provides:

"*Redhibition* is the avoidance of a sale on account of some vice or defect *in the thing sold,* which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice." (Emphasis added.)

The plaintiff's burden in a suit on redhibition was discussed in *Rey v. Cuccia,* 298 So.2d 840, 842–43 (La.1974) (Tate, J.):

"A redhibitory defect entitling the buyer to annul the sale is some defect in the manufacture or design of a thing sold 'which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice.' Article 2520. Upon proof of such a defect, the buyer is entitled to annul the sale and recover the purchase price, rather than being limited to recovering the cost of curing any such substantial defects. Prince v. Paretti Pontiac Company, Inc., 281 So.2d 112 (La.1973).

"The buyer must prove that the defect existed before the sale was made to him. Article 2530. However, if he proves that the product purchased is not reasonably fit for its intended use, it is sufficient that he prove that the object is thus defective, without his being required to prove the exact or underlying cause for its malfunction....

"The buyer may prove the existence of redhibitory defects at the time of the sale not only by direct evidence of eyewitnesses, but also by circumstantial evidence giving rise to the reasonable inference that the defect existed at the time of the sale."

*See also Sweeney v. Vindale Corp.,* 574 F.2d 1296, 1298, 1301 (5th Cir.1978).

**7.** *Weber v. Fidelity & Casualty Ins. Co. of N.Y.,* 259 La. 599, 250 So.2d 754 (La.1971) (Tate, J.), "established the Louisiana law of products liability." *Cook v. McDonough Power Equip., Inc.,* 720 F.2d 829, 831 (5th Cir.1983) (per curiam). Then Justice Tate wrote in *Weber* that a plaintiff seeking to establish a products liability claim "has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect." 250 So.2d at 755. Relying on *Weber,* the Supreme Court of Louisiana has outlined the following test in products liability cases:

"[I]n order to recover from a manufacturer or supplier the plaintiff must prove (1) that the injury or damage resulted from the condition of the product; (2) that the condition made the product unreasonably dangerous to normal use; and (3) that the condition existed at the time the product left the control of the manufacturer or supplier." *Bell v. Jet Wheel Blast,* 462 So.2d 166, 168 (La.1985).

**8.** *See* note 1, *supra.*

on special interrogatories finding that the aircraft contained a redhibitory defect, that the negligence of Garrett and Cessna (but not Cruse) was a proximate cause of the loss of the aircraft, and that the aircraft and its component parts were defective at the time they were manufactured by Cessna and Garrett, which defects were a proximate cause of the loss.[9] The same day the district court entered judgment on the jury verdict, awarding Nichols $964,000, with interest from the date of judgment, against Cessna and Garrett. Although the jury found a redhibitory defect, the court did not render judgment against Cruse, apparently because the court had reserved ruling on the motions for directed verdict on the redhibition claim, as the verdict otherwise exonerated Cruse.[10]

Cessna and Garrett filed timely motions for judgment notwithstanding the verdict or, in the alternative, for a new trial. The district court subsequently issued a Minute Entry memorandum granting these motions on the ground that there was insufficient evidence to support a verdict for Nichols. The court then entered judgment

vacating its prior judgment on the verdict, granting Cessna's and Garrett's motions for judgment notwithstanding the verdict, and granting Cruse's motion for directed verdict, thus rendering judgment in favor of all defendants. In the alternative, the court ordered that if the jury's verdict were reinstated on appeal, the motions of Cessna and Garrett for a new trial were granted.

## Discussion

### I. Judgment Notwithstanding the Verdict and Directed Verdict

Appellant Nichols argues that the district court erred by granting judgment notwithstanding the verdict on Garrett's and Cessna's motions, and a directed verdict on Cruse's motion, since there was substantial evidence in support of the jury verdict.

*Substantial Evidence*

The standard of review for a motion for judgment notwithstanding the verdict or directed verdict "is firmly established in this Circuit." *McCormack v. Noble Drilling Corp.*, 608 F.2d 169, 171 (5th Cir.

**9.** The interrogatories and the jury's answers were as follows:

"1. Did the aircraft contain a redhibitory defect at the time of its sale to plaintiff Nichols Construction Corporation?

"Yes X No __

"...."

"2. Was the aircraft or its component parts defective at the time it was manufactured by the respective defendants, and was such defect a proximate cause of the plaintiff Nichols Construction Corporation's loss?

"Cessna Aircraft Co. Yes X No __

"The Garrett Corp. Yes X No __

"...."

"3. Did Lewis Benscotter misuse or mishandle the aircraft or its components?

"Yes __ No X

"...."

"4. Were any of the defendants negligent in a manner that was a proximate cause of plaintiff Nichols Construction Corporation's loss?

"Cessna Aircraft Co. Yes X No __

"Cruse Aviation, Inc. Yes __ No X

"The Garrett Corp. Yes X No __

"...."

"5. Was Lewis Benscotter negligent in a manner that was a proximate cause of the loss of the aircraft?

"Yes __ No X

"...."

"6. What amount will fairly and adequately compensate plaintiff Nichols Construction Corporation for its loss?

"$964,000.00."

**10.** Nichols' suit against Cruse was based solely on redhibition and negligence, and the jury acquitted Cruse of negligence. With respect to the redhibition claim, Cruse would be entitled to indemnity from Cessna under La.Civ.Code Ann. art. 2531, which provides in part:

"In any case in which the seller is held liable because of redhibitory defects in the thing sold, the seller shall have a corresponding and similar right of action against the manufacturer of the thing for any losses sustained by the seller, and further provided that any provision of any franchise or manufacturer-seller contract or agreement attempting to limit, diminish or prevent such recoupment by the seller shall not be given any force or effect."

1979).[11] In determining whether judgment n.o.v. or a directed verdict should have been granted,[12]

"the Court should consider all the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is *substantial evidence* opposed to the motions, that is, evidence of such *quality and weight* that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. *A mere scintilla of evidence is insufficient to present a question for the jury.* The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. *There must be a conflict in substantial evidence to create a jury question.* However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc) (emphasis added and footnote omitted).

*See also Doucet v. Diamond M. Drilling Co.*, 683 F.2d 886, 889 n. 2 (5th Cir.1982), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983).[13] Because of the requirement that the verdict be supported by *substantial* evidence, a verdict may not rest on speculation and conjecture.[14] *Mack v. Newton*, 737 F.2d 1343, 1351 (5th Cir. 1984); *see Fenner v. General Motors Corp.*, 657 F.2d 647, 651 (5th Cir.1981) (per curiam), *cert. denied*, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *Gulf Coast Real Estate Auction Co., Inc. v. Chevron Indus., Inc.*, 665 F.2d 574, 577 (5th Cir.1982). Similarly, the jury's free-

**11.** In a diversity case, "the sufficiency or the insufficiency of the evidence in relation to the verdict is indisputably governed by a federal standard." *Fairley v. American Hoist & Derrick Co.*, 640 F.2d 679, 681 (5th Cir.1981) (per curiam); *Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506, 523 (5th Cir.1984).

**12.** We apply the same standard on review as that to be applied by the district court. *Worthington Corp. v. Consolidated Aluminum Corp.*, 544 F.2d 227, 232 (5th Cir.1976); *Alman Bros. Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc.*, 437 F.2d 1295, 1298 (5th Cir.1971).

**13.** In determining whether there was substantial evidence to support the jury verdict, we are mindful of the rule that we are to avoid reweighing evidence and judging the credibility of witnesses; "our function is limited to determining whether there is a conflict in substantial evidence sufficient to create a jury question." *Two Rivers Co. v. Curtiss Breeding Serv.*, 624 F.2d 1242, 1249 (5th Cir.1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 348 (1981); *Crowe v. Lucas*, 595 F.2d 985, 989 (5th Cir.1979) ("Thus in reviewing a judgment notwithstanding the verdict, a court's task is not to re-evaluate the evidence to form its own conclusions regarding the correctness of the jury verdict. Rather, *Boeing* requires us to determine wheth-

er reasonable men could, on any theory submitted to the jury, have resolved the dispute as the jury did."); *Gaspard v. Taylor Diving & Salvage Co., Inc.*, 649 F.2d 372, 374 n. 2 (5th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982) (same). We similarly acknowledge that, in view of the seventh amendment guarantee of the right to jury trial, "we must proceed cautiously, and we must validate the jury verdict if at all possible." *Gaspard*, 649 F.2d at 374 n. 2; *Lucas v. American Mfg. Co.*, 630 F.2d 291, 293 (5th Cir.1980).

**14.** As noted in *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc), quoted in text, "substantial evidence" is defined as "evidence of such *quality and weight* that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." 411 F.2d at 374 (emphasis added); *see also Croce v. Bromley Corp.*, 623 F.2d 1084, 1089 (5th Cir.1980), *cert. denied sub nom. Bromley Corp. v. Cortese*, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981). As we indicate in text, if the evidence supporting the jury's verdict is so lacking in quality and weight that we must conclude that a jury verdict in favor of a plaintiff rested on speculation and conjecture, "substantial evidence" will not be found and the granting of a judgment notwithstanding the verdict will be deemed proper.

dom to draw inferences from the evidence does not extend so far as to allow a "wholly 'unreasonable inference' or one which amounts to 'mere speculation and conjecture.'" *Mack*, 737 F.2d at 1351 (quoting *Bridges v. Groendyke Transport, Inc.*, 553 F.2d 877, 878–79 (5th Cir.1977)).

■ Considering all the evidence, and viewing it in the light and with all reasonable inferences most favorable to Nichols, we find that there was insufficient evidence supporting appellant's theory of the cause of the accident to present a question for the jury. The only evidentiary support for plaintiff's theory of causation, the testimony of an expert witness, was purely speculative. Therefore, we affirm the district court's granting of judgment notwithstanding the verdict for Cessna and Garrett and directing a verdict for Cruse.

As noted, no wreckage was ever recovered from the Conquest after its crash into the Atlantic Ocean, nor were the victims' bodies ever found. The radio contacts picked up from the Conquest, and transcribed in the record, fail to provide any indication of the possible cause of the plane's crash. There was no evidence that any other aircraft employing the same style valve and retention ring used in the Conquest had ever experienced difficulty because of defects in either the ring or valve, nor was there evidence that any cracked or defective ring or valve had ever been discovered in any such aircraft.[15]

In lieu of presenting direct evidence concerning the cause of the crash, plaintiff-appellant presented testimony by Thomas Lombardo, an expert witness in the field of aeronautical engineering. Lombardo's testimony provided the sole evidence concerning plaintiff's causation theory.[16] Lombardo acknowledged that he did not inspect the wreckage of the aircraft, since there was "none available to inspect." He similarly acknowledged that "there were no

---

**15.** Cracked rings were detected during the manufacturing process. The sole evidence on the subject indicated that only twenty-seven cracked rings, out of 15,000 manufactured, were found. The evidence indicated that the cracks occurred in the manufacture of the rings or possibly during the process of their assembly (by Garrett) onto the valves. There was no evidence of any subsequent cracks or breaks in any ring. No evidence was presented indicating that an outflow or safety valve with a cracked ring was ever actually installed on an aircraft. *See* note 23, *infra* (discussing failure to find defective rings or valves aboard the 109 airplanes which were the subject of the Service Bulletins).

**16.** Nichols argues that in addition to Lombardo's testimony, "there was considerable evidence on the issue of causation from various witnesses and exhibits." Upon reviewing the record, we conclude that Lombardo in fact provided the only evidence for plaintiff concerning causation. Much of the evidence Nichols cites to support its theory of causation consisted of rebuttal as to other potential causes. Nichols presented evidence that indicated that the Conquest experienced turbulence throughout the flight to rebut the theory that the accident occurred because Benscotter fell asleep. To counter the theory that the pilot simply forgot to turn on the pressurization system, appellant introduced evidence that the pressurization system would have to have been turned on in order for the plane's heating system to work; since the Conquest's last flight took place in November, appellant argued that the passengers would have experienced freezing temperatures well before the oxygen content had a chance to thin out, thereby calling their attention to the fact that the pressurization system was not operating. Appellant also presented evidence that Benscotter had been in excellent health and pointed out that there was no indication that Rein ever attempted to make radio contact, both facts somewhat militating against the theory that Benscotter suffered a disability other than hypoxia, such as a heart attack or stroke. This evidence, however, does not tend to establish that the plane crash was caused by the breaking of a defective retention ring and consequent malfunction of the valve. Examining such evidence, and the reasonable inference therefrom, in the light most favorable to Nichols, it at most tends to lessen the likelihood of the possibilities that Benscotter fell asleep, that he forgot to turn the system on, and that he suffered a stroke or heart attack, from the enormous range of possible explanations for the cause of the accident. There was no showing tending to exclude every reasonably possible explanation of the accident other than that offered by Nichols.

Appellant also argues that the jury could infer causation from the existence of defective rings and valves. Appellant's evidence concerning whether the rings and valves that were installed on *appellant's aircraft* were in fact defective, and whether causation may be inferred from the existence of defects, is discussed in notes 20–23, *infra*, and accompanying text.

records to investigate." Lombardo stated in overview, "I conducted an analysis of information that was available; you might call that an investigation." [17]

When asked whether he had "formed an opinion as to the cause of the loss of this aircraft," Lombardo responded:

"My opinion is that the *most reasonable explanation* as to what occurred was a failure of the pressurization system in the airplane due to faulty valves which control this pressurization. This led to the lack of oxygen in the cockpit and cabin area, causing the pilot to be incapacitated due to lack of oxygen." (Emphasis added).

Lombardo presented two separate scenarios to explain how the pilot might have become incapacitated because of a lack of oxygen, or hypoxia. Lombardo stated that the retention ring in either the outflow or safety valve could have broken and jammed the valve in an open position. As a result, the aircraft would become underpressurized and the pilot would become incapacitated for lack of oxygen. Alternatively, Lombardo testified that the retention rings in *both* the outflow and safety valves could have broken in a closed position, causing initial overpressurization; at some point the pressure would have exceeded the aircraft's structural capacity, causing ruptures and leaks in the structure and, eventually, underpressurization. [18] Lombardo, though, repeatedly refused to indicate *which* of the two possibilities was more likely, [19] and stated, *"The best I could say* is either one of them *could* happen." (Emphasis added.) He added, "[I]t's highly likely it failed closed; it's highly likely it failed open. I can't tell you one from the other. I wish I could; I can't."

In *Fenner v. General Motors Corp., supra,* this Court, addressing similar facts, affirmed a district court's grant of a judgment notwithstanding the verdict on the ground that there was insufficient evidence

---

17. When asked what his analysis consisted of, Lombardo listed such factors as the weather; the radio contacts; the pilot's medical examinations; the maintenance, parts, and pilot handbooks generally applicable to a Conquest Model 441; his examination of similar outflow and safety valves, although Lombardo acknowledged that he never saw the specific valves that were used in Nichols' airplane; and the FAA's certification documents for that model of aircraft.

18. *See* note 1, *supra.*

19. *See* the following from Lombardo's cross-examination:

"Q [T]he valve failed to operated [*sic*] properly?
"A That's correct.
"Q That it failed in an open position?
"A I said either one, open or closed.
"Q I thought you said that it was open, that you felt it failed open.
"A One failure mode will fail it in the open position and the other failure mode in the closed position, pressuring the aircraft and resulting in structural damage in the aircraft, then loss of the pressurization as a result of the structural failure.
"Q So that you have two scenarios?
"A That's correct.
"....
"Q Which happened? You don't know which one happened?

"A No, I don't know, sir.
"Q You don't know whether it failed open or closed?
"A No, I do not.
"Q You don't know whether there was an initial underpressurization or an initial overpressurization?
"A That's correct."
At a later point, Lombardo responded to further cross-examination:
"Q [U]nder the scenario of having the closed valve failure [you would] have to assume that you had a double failure?
"A That's correct....
"Q *Do you have anything to show that it happened in this case?*
"A *No, sir.*" (Emphasis added.)
Still later, Lombardo answered the following question:
"Q Which of those two is the more likely in your opinion, sir?
"A Well, I have difficulty which is the most likely .... The best I can say is either one of them *could* happen." (Emphasis added.)
Finally, Lombardo testified during cross-examination:
"A ... But both of them had failed or one had failed, depending in mode. I described two different modes. One mode is where either valve could fail; the other mode is where two of them failed.
"Q As you sit here today, you can't tell the jury or us which one of those is more likely?
"A No way I could do that."

to establish that an existent product defect was the proximate cause of a single-car accident. While the district court had found that the vehicle "was manufactured with an inherent steering defect and that General Motors [the manufacturer] had knowledge of the defect," the court also had found that "the evidence was not sufficient to create a jury question that the defect was the proximate *cause* of the accident." 657 F.2d at 649 (emphasis added). We affirmed. 657 F.2d at 648. As in the present case, the testimony of witnesses "shed no light on the cause of the accident" and the vehicle itself "was unavailable for later examination." 657 F.2d at 649. We wrote:

> "Plaintiffs showed at trial that the uncovered steering coupling of their model vehicle *could* suffer from stone interference if a stone lodged between the steering coupling and the vehicle's frame. This stone interference *could* cause the vehicle's steering to lock up. Plaintiffs then attempted to show this is what happened with their automobile.
>
> "....
>
> "The evidence ... to prove causation is simply not present in this case.... [T]here was no examination of the [plaintiffs'] automobile and no stone discovered lodged inside the steering coupling.
>
> "....
>
> "Plaintiffs are not entitled to a verdict based on speculation and conjecture. *See Smith v. General Motors Corp.*, 227 F.2d 210 (5th Cir.1955)." 657 F.2d at 649–51 (emphasis added).

The Ninth Circuit, in *British Airways Bd. v. Boeing Co.*, 585 F.2d 946 (9th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979), faced a similar claim raised by the owner of a plane against its manufacturer, alleging, *inter alia*, negligent design and manufacture of the aircraft. The district court granted summary judgment in favor of the manufacturer, and the Ninth Circuit affirmed. The Court wrote:

> "[The appellant-owner] ... introduced the deposition testimony of a Boeing employee that a crack in the terminal fitting *can* [emphasis in original] lead to a catastrophic accident. However neither that witness nor any other witness produced by [appellant] has been able to produce specific facts showing, or even creating an inference, that the crack *did* [emphasis in original] lead to the accident in question....
>
> "....
>
> "... After twelve years of investigation and litigation, all [appellant] has come up with is supposition, speculation, and conclusory argument of counsel. Because it has presented no evidence 'sufficient ... to require a jury or judge to resolve the parties' differing versions of the truth at trial,' even after all permissible inferences have been drawn in its favor, we hereby affirm the decision of the court below as to this issue." 585 F.2d at 951–54.

As in the *Fenner* and *British Airways* cases, Lombardo's testimony was essentially speculative in nature. Lombardo indicated that both the outflow and safety valves "could" have jammed in a closed position *or* that either the safety or outflow valves "could" have jammed in an open position, thereby causing the accident. However, when he was asked in connection with the closed valve scenario, "Do you have anything to show that it happened *in this case*," Lombardo responded, "No, sir." (Emphasis added.) In addition, he indicated that the closed and the open valve scenarios were equally likely; in other words, he had no more support for the open valve theory than he had for the closed valve scenario. Lombardo, by process of elimination, picked what he considered the most plausible explanation for the crash and concluded only that it was the best guess as to what caused the accident. His testimony merely speculated as to the cause of the crash. We have frequently held that a verdict resting on speculation cannot be sustained. *Mack*, 737

F.2d at 1351; *Fenner,* 657 F.2d at 651; *Chevron,* 665 F.2d at 577.[20]

Our conclusion respecting the insufficiency of Lombardo's testimony is also influenced by the fact that, although the district court permitted him to testify as an expert, Lombardo did not purport to rely on his *own* expertise when offering his opinion on causation. When asked how he had come to the conclusion that the most reasonable explanation for the accident was ring breakage and consequent valve failure, Lombardo did not indicate that he had relied on any expert knowledge, general or otherwise, of his *own* respecting how such valves work or how a retention ring might crack under the circumstances posed in the instant case. Instead, Lombardo indicated that he saw certain Garrett and Cessna documents, which he was unable to identify or quote from with any meaningful particularity, that stated that the rings were defective and that the assembly fixture was out of tolerance, and that he heard someone at a deposition say "something about" how stronger material should have been used. In response to the question, "Why do you say that the retention rings were defective," Lombardo stated, "Well, sir, in my analysis and in the documents and information that I reviewed, *this was stated by engineers of the manufacturer. They are the ones that said it was defective, and I relied on that,* and the defect was due to manufacturing techniques or assembly techniques and possibly the selection of materials for the ring." (Emphasis added.) Later in his testimony, Lombardo similarly listed the cause of the alleged ring failure as the "manufacturing process and the failure for inspection to catch such defects after they were manufactured." Still later, the following exchange occurred during Lombardo's cross-examination:

"A [Lombardo]: ... I said it was a manufacturing problem with the molding of the rings, the subsequent inspection of the molded components, the assembly of the rings to the valve, and possibly the selection of the materials that were used for making the rings.

"....

"Q [Attorney for Cessna]: Now, I guess if we get then to the assembly—

"A Assembly.

"Q What could be the possible problem there?

"A *There I'm relying on the documents from Garrett.* They refer to an assembly fixture that may have been out of tolerances, which caused failure of these rings.

---

**20.** Even if we were to assume that the Conquest actually contained a defective valve, an issue taken up at note 23, *infra,* and accompanying test, this fact would not necessarily satisfy the requirement under Louisiana law that the defect must be shown to have *caused* the accident. There was no evidence that even if a valve contained a defective, or cracked, retention ring, the ring would inevitably, or even probably, detach and jam a valve in either an open or closed position. In *Fairley v. American Hoist & Derrick Co.,* 640 F.2d 679, 681 (5th Cir.1981) (per curiam), we wrote, "A showing that a product had a mechanical defect is not enough if it did not cause or contribute to the cause of the injury ...." *See also Fenner,* 657 F.2d at 650 ("Proof of the defect alone is insufficient. There must also be evidence that the defect caused the accident"; holding that while a vehicle "was manufactured with an inherent steering defect," there was no proof that this admitted defect caused the accident). We concluded in *Fairley:*

"We are forced to the conclusion that while a *Boeing* jury could have found that the 999–C had brakes which on occasion were rough or grabbed, the record is simply devoid of evidence that when American Hoist & Derrick sold this crane, or at any subsequent time for that matter, it had a defect *which caused* the cage to take the free fall which directly precipitated this regrettable accident." *Fairley,* 640 F.2d at 682 (emphasis added).

Likewise, in *Bernard v. Cessna Aircraft Corp.,* 614 F.2d 1075 (5th Cir.1980), a Louisiana diversity action, we rejected a plaintiff's claim that the failure to provide a floor window or a sunroof when designing an aircraft constituted negligence. We stated that "there is not substantial evidence *that this caused or contributed to the collision.*" 614 F.2d at 1078 (emphasis added). We rejected additional claims brought against a separate defendant in the same case on the grounds that there was "no evidence supporting any causal connection between any one of [plaintiff's theories] ... and the accident" and that plaintiff's theories were "purely speculative." 614 F.2d at 1077.

"MR. ADLER [attorney for Garrett]: I move to strike that there is no reference to an assembly tolerance. I don't know what the witness is talking about. There has been no document exhibited or read from.

"THE COURT: I'm not sure I do either, but I don't believe that is any basis upon which to strike testimony. I will have to overrule the objection.

"[Q] Could you detail that for us?

"A Yes. *It was on documents that were between Garrett and Cessna.* I saw one of these documents in there that was describing this particular problem." (Emphasis added.)

The alleged documents never were identified by date or otherwise. Lombardo's cross-examination continued:

"Q Anything other that the molding process, inspection of the molded material, and then the assembly of the unit?

"A And I said possibly the selection of the materials.

"Q What do you mean by that?

"A This is—I attended a deposition in California of AiResearch material people; I believe their name was Fradell (spelled phonetically), and *he said something about the material composition and possibly the introduction of Fiberglas or something to make the materials more suitable.*" (Emphasis added.)

Lombardo did not draw his own expert opinion based on an independent analysis of the evidence so much as he relied on his impression or interpretation of the conclusions of others as expressed in unidentified documents and deposition.[21] As the district court noted in its Minute Entry, "He did not come to [his] … conclusion … through the application of *his* expertise." (Emphasis added.)

Moreover, Lombardo's response to questions concerning his expertise revealed that he had no firsthand knowledge of or expertise concerning the workings of valves and retention rings of this kind. During direct examination, Lombardo indicated that he had investigated approximately 400 airplane accidents since 1974. Lombardo indicated that he had *seen* the Conquest Model 441 two or three times before he was retained in the instant case, and looked at three such models after being retained. He added, however, that he had never flown in this type of aircraft before. He also stated that while he knew what an outflow valve "look[ed] like" prior to being retained in the present case, he had never seen a retention ring before and had never seen a plastic valve such as the one used in the Conquest prior to working on the case. The following exchange occurred at trial:

"Q Prior to working on this case, had you ever seen one of these rings before?

"A *This is the first time I've seen one of these specific rings.* Of course, you know, you wouldn't even know it's there just by looking at the valve. I found the ring from drawings and from discussions and from documents.

"Q *You hadn't seen one of these valves before or worked on one of these valves?*

"A *Not a plastic one. I've seen a metallic valve.*" (Emphasis added.)

Lombardo had no expertise in the manufacture, design, or working of rings or valves of this variety. His testimony, "stripped of its claim of expertise," lacks the quality and weight characteristic of substantial evidence. *District of Columbia Redev. Land Agency v. Thirteen Parcels of Land,* 534 F.2d 337, 340 (D.C.Cir.1976) (employing language in a different context). In essence, Lombardo, without adequate foundation, was merely "tell[ing] the jury what result to reach." *See Matthews v. Ashland Chemical, Inc.,* 770 F.2d 1303, 1311 (5th Cir.1984).[22]

---

**21.** And, the secondhand information was not from generally recognized technical literature.

**22.** We do not hold that Lombardo was not qualified to testify or that an expert must have firsthand experience with the particular alleg-

edly defective component in order to testify respecting its role in a given accident. Rather, our holding is that Lombardo's relevant conclusions were not based on his own expertise, and do not furnish substantial evidence to support a

We similarly conclude that there was a lack of substantial evidence to indicate that the aircraft contained a defective ring and valve, let alone one that caused the instant crash. The Cruse mechanic, just before the flight in question, checked the valves and pressure system and found no defect. There is no evidence that the procedures he used would not have disclosed a defect if one had been present. No direct evidence was introduced concerning the condition of the retention rings and valves installed in Nichols' aircraft either at the time of manufacture or afterward. Nichols relied on Lombardo's testimony and on the series of telex communications between Garrett and Cessna to establish that the rings installed in the Conquest were defective. As noted, Lombardo was asked during direct examination, "Why do you say that the retention rings were defective." Lombardo responded that he was relying on certain documents between Cessna and Garrett and on a conversation he heard during a deposition. This is entirely too vague. As noted, Lombardo was not an expert on the manufacture, design, or working of rings or valves of this sort, and the matter referred to was not recognized technical literature or the like. Moreover, it was never shown that Lombardo or his sources had firsthand knowledge concerning the inspection or assembly of the specific rings and valves installed in Nichols' aircraft. Likewise, the telex communications between Garrett and Cessna merely indicated that some aircrafts "may" contain broken diaphragm retention rings.[23] The telexes in no way suggested that this problem had been detected in any aircraft, as opposed to being discovered at the valve manufacturing stage, or that such a defect was likely to be present. We do not believe the jury could infer from this evidence that ring breakage *did* occur in *Nichols'* plane. "We are not unmindful of the difficulty of proving a manufacturing or design defect under the circumstances of this case." *Horton v. W.T. Grant Co.*, 537 F.2d 1215, 1218 (4th Cir.1976). As we noted in *Mack*, however, a jury's freedom to draw reasonable inferences does not extend so far as to allow the jury to draw an inference "which amounts to 'mere speculation and conjecture.'" 737 F.2d at 1351.

finding that the ring was defective and the accident caused thereby.

**23.** As evidence in support of its claim that the rings and valves that were installed in Nichols' aircraft were defective, Nichols introduced exhibits consisting of the telex communications between Garrett and Cessna. The initial telex Service Bulletin between the two defendants stated:

"It has come to the attention of AiResearch Manufacturing Company of California [Garrett] that a problem *may* be encountered with the aircraft cabin pressure system supplied for all Cessna twin engine aircraft due to the failure of a vendor furnished ... diaphragm retention ring which is installed in the subject outflow and safety valves. Preliminary investigation of the cause of the ring failure indicates that vendor material used in fabricating the ring lacked sufficient strength due to an improper process procedure being used to form the ring. The failure of the retention ring is characterized by a clean break across the diameter of the ring material which will cause the ring to fall into the seat area of the poppet valve. *If* this occurs, the valve will fail closed and will not perform its normal pressure relief and depressurization functions.

"The *potential* exists for either valve to fail closed, or for both valves to fail closed, concurrently." (Emphasis added.)

Subsequent telexes contained even less specific language. *See* test, *supra*, accompanying note 3. While this evidence suggests that some retention rings may have been broken, the suggestion that the rings installed in *Nichols' craft* were defective is purely speculative. Our conclusion is reinforced by the fact that the 109 planes affected by the Service Bulletin failed to yield a single report of a broken ring and that no other mishaps involving a broken retention ring had been reported. *See* note 15, *supra*. Nichols also relies on the deposition of Paul James Taylor, a project engineer for cabin pressure control systems with Garrett, as proof that the rings installed in Nichols' plane were defective. Taylor confirmed that the "rings, in the opinion of Garrett, didn't meet the existing quality standards [of the company]." Taylor's comment, however, was directed to the quality of the retention rings in general, and was not a specific reference to the rings installed in the Nichols airplane. Further, Taylor's confirmation that the rings did not meet *Garrett's* quality standards, by itself, does not suffice to establish that the rings were defective and dangerous in the absence of evidence concerning the nature and stringency of Garrett's in-house standards.

In the absence of proof of causation and of the condition of the rings and valves, we cannot sustain a jury's verdict finding negligence and products liability.[24] In the absence of any evidence concerning the condition of the rings and valves installed in Nichols' plane, we cannot sustain a finding of a redhibitory defect.[25] Therefore, we affirm the district court's determination that the verdict was not supported by substantial evidence.

## II. Other Complained of Rulings

In the alternative, Nichols argues that if this Court finds that there is an absence of substantial evidence to sustain the jury's verdict, it is entitled to a new trial on the grounds that the district court erred in certain of its evidentiary rulings. Appellant argues that the district court should not have excluded from evidence its exhibit consisting of an outflow valve with a broken diaphragm retention ring. Appellant argues that the court's failure to admit this defective valve deprived the jury of the opportunity to observe how a broken ring would affect the operation of the valve. Nichols also argues that the district court erroneously allowed Jules Viquesney to testify as an expert for defendants on pressurization systems and outflow and safety valves, even though he earlier had denied that he was an expert in those fields. Nichols argues that it was prejudiced by the district court's decision because it had not been apprised before trial as to Viquesney's opinions nor the factual bases supporting them. As a result, it claims that it was unable to effectively cross-examine Viquesney or counter his opinion testimony. Third, Nichols contends that the district court improperly granted a *directed verdict* for defendant Cruse after submitting the issues of negligence and redhibition to the jury. It argues that the proper motion would have been one for *judgment notwithstanding the verdict,* and that Cruse failed to file such a motion. We reject each of these arguments.

### Exclusion of Broken Valve

Nichols attempted to introduce into evidence a valve with a broken retention ring so that Lombardo could show the jury how a broken retention ring might cause a valve to jam in either an open or a closed position. It was not shown that the valve or ring were the same kind as those employed in the crashed airplane. Other exemplar rings and valves were in evidence. The court sustained defendants' objection to the admission of this evidence. We affirm the district court's ruling.

"Time and again we have stated that the admission of evidence is within the sound discretion of the district court.... Absent proof of abuse an appellate court will not disturb a district court's evidentiary rulings." *Jon-T Chemicals, Inc. v. Freeport Chemical Co.,* 704 F.2d 1412, 1417 (5th Cir.1983) (per curiam). *See also Shipp v. General Motors Corp.,* 750 F.2d 418, 427 (5th Cir.1985) ("The admission of ... demonstrative evidence is within the trial court's sound discretion and will not be disturbed on appeal absent 'abuse.' "). Moreover, there will be no reversal on appeal for a district court's exclusion of evidence "unless a substantial right of the party is affected." Fed.R.Evid. 103(a); *Johnson v. William C. Ellis & Sons Iron Works, Inc.,* 609 F.2d 820, 823 (5th Cir. 1980).

We hold that the court acted within its discretion in excluding the defective valve. Further, the proffered evidence would not have cured the deficiency in proof which we have found, and, since the jury found in favor of Nichols without the evidence,[26] its exclusion was at all events harmless.

---

**24.** *See* notes 5 & 7, *supra* (discussing required showings a plaintiff must make to recover for negligence or products liability under Louisiana law.).

**25.** *See* note 6, *supra* (discussing plaintiff's burden in a suit to recover for a redhibitory defect). We do not reach the question of whether, if there were a cracked ring which caused the accident, this would allow recovery *under a redhibition theory.*

**26.** While the jury found in favor of Cruse on the negligence issues, it found against Cessna and Garrett on these and all other issues, and the exhibit in question was not aimed at Cruse. It

*Admission of Expert Testimony*

Appellant also requests a new trial on the ground that the district court permitted Jules Viquesney to testify as an expert concerning the Conquest's pressurization system in spite of his lack of qualifications as an expert in that area. Nichols claims prejudice because it had not been apprised prior to trial of Viquesney's opinions and the factual bases supporting them, thereby thwarting its ability to obtain discovery and effectively cross-examine the witness at trial. We reject these arguments.

■ The district court permitted Viquesney to testify as an expert in the field of aeronautical engineering. A review of his credentials, including extensive experience and schooling in the aeronautics field, satisfies us that the district court did not abuse its broad discretion by allowing him to testify as an expert. Moreover, the district court advised the jury that while Viquesney might testify as to some aspects of the pressurization system, that field was outside his "specific area of responsibility." Our disposition of appellees' sufficiency of the evidence contentions in no way depends on any testimony by Viquesney in respect to these areas, and, as the jury found in favor of Nichols notwithstanding the testimony of Viquesney,[27] admission of his testimony was harmless in any event.

■ We likewise reject appellant's contention that it has been prejudiced because it was not apprised of Viquesney's opinions and the factual bases supporting them prior to trial. As the district court noted, Viquesney's "name was listed on the pretrial order as an expert that might be called, although not specifically as to why." In addition, appellant deposed the witness on two occasions prior to trial. We reject the claim that appellant was deprived of the opportunity to obtain discovery and effectively cross-examine the witness at trial.

*Directed Verdict for Defendant Cruse*

■ Nichols argues that Cruse failed to file a motion for judgment notwithstanding the verdict, and that the district court therefore erred when it granted a directed verdict for Cruse after the case had been submitted to the jury and its verdict received. Appellant argues that the court, by granting a directed verdict, in effect granted a judgment n.o.v. without Cruse's having submitted a proper motion, in violation of Fed.R.Civ.P. 50(b). As a result, it argues that even if the verdict against defendants-appellees Cessna and Garrett is not reinstated, the directed verdict for Cruse should be reversed and remanded for entry of a judgment against Cruse. We reject this contention. The district court here had expressly reserved its ruling on Cruse's motion for directed verdict made at the close of all the evidence, and never entered a judgment against Cruse.

In *Burris v. Willis Indep. School Dist., Inc.,* 713 F.2d 1087, 1096 n. 7 (5th Cir.1983), we wrote:

"We wish to stress that the motion for directed verdict [in this case] was granted after a thirteen-day jury trial. Under such conditions, *a more appropriate approach* by the district court would have been to hold its ruling until *after* the verdict, and *treat it as a motion for a judgment n.o.v.*" (Emphasis added.)

Other Courts of Appeals have made similar statements. *See, e.g., Holmgren v. Massey-Ferguson, Inc.,* 516 F.2d 856, 859 n. 2 (8th Cir.1975) ("Once again we emphasize the wisdom and expediency of reserving a ruling on such motions [for directed verdict] until the jury has had the opportunity to weigh the evidence.").[28]

---

is quite evident that the absence of this exhibit did not influence the verdict to the extent that it favored Cruse.

**27.** The comments in note 26, *supra,* are likewise applicable as to this claim.

**28.** Reservation of decision on a motion for directed verdict minimizes the risk that a case will

have to be retried in the event this Court should determine that there was substantial evidence to take the case to the jury. *Burris,* 713 F.2d at 1096; *Malone & Hogan Hosp. Found. v. Boston Ins. Co.,* 378 F.2d 362, 363 (5th Cir.1967) (per curiam).

In *Johnson v. New York, N.H. & H.R. Co.*, 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77 (1952), the Supreme Court considered a Jones Act case in which at the close of all the evidence the sole defendant moved for a directed verdict, and the district court reserved decision on the motion and submitted the case to the jury, which returned a verdict for the plaintiff, on which judgment for the plaintiff was then entered. The defendant, within ten days after the verdict, made a motion which the Supreme Court construed as being one for a new trial, but not for a judgment notwithstanding the verdict. More than two months later, the district court entered an order denying the motion for new trial and also the motion for directed verdict on which decision had been reserved. On the defendant's appeal, the Second Circuit held that the motion for directed verdict should have been granted and entered a judgment which, as construed by the Supreme Court, "requires the District Court to enter judgment for the [defendant] railroad notwithstanding the verdict, thereby depriving petitioner [plaintiff] of another trial." *Id.*, 73 S.Ct. at 126. The Supreme Court reversed, holding that the absence of a motion for judgment notwithstanding the verdict under Fed.R.Civ.P. 50(b) prevented the action taken by the Second Circuit, which should only have reversed and ordered a new trial.

We believe that several features present in this case, but not in *Johnson,* properly distinguish that decision. To begin with, in *Johnson* it was the power of the appellate court which was at issue, while here we deal with the power of the trial court. *Johnson* itself describes the issue before the Court as one "concerning the power of a Court of Appeals to render judgment for a defendant instead of ordering a new trial," and states that "the single issue" on which review was granted was "[w]hether the Court of Appeals could direct such a judgment consistently with Rule 50(b)."

*Id.* at 126. Part of the Court's reasoning seems to rest on the thought that such action by an appellate court prevented the losing party there from invoking the district court's discretionary authority to order a new trial instead of a judgment against it. *See id.* at 126–27. The Court also relied on the fact that it had previously refused to adopt a proposed amendment to Rule 50(b) "which would have given appellate courts power to enter judgments for parties who, like this respondent, had made no timely motion for judgment notwithstanding the verdict." *Id.* at 128. These factors sufficed to convince the Seventh Circuit that *Johnson* was inapplicable to action by the district court. *Shaw v. Hines Lumber Co.*, 249 F.2d 434 (7th Cir.1957). Nevertheless, we must observe that the Supreme Court *did* state in *Johnson* that "in the absence of a motion for judgment notwithstanding the verdict made in the trial court within ten days after reception of a verdict the rule forbids the *trial judge* or an appellate court to enter such a judgment." *Johnson,* 73 S.Ct. at 127 (emphasis added).[29]

Another distinguishing feature of *Johnson* is that there the district court's action on the motion for directed verdict came at a time when not only had no motion for judgment n.o.v. been filed, but when the time for filing such a motion had long since expired (over two months after verdict, *see* note 29, *supra*). Here, by contrast, when the district court granted Cruse's motion for directed verdict, on which it had reserved ruling, no judgment had been entered for or against Cruse, and Cruse consequently was still entitled (under the current version of Rule 50(b), *see* note 29, *supra*) to file a motion for judgment n.o.v. This same factor led the First Circuit to distinguish *Johnson* in *First Safe Deposit National Bank v. Western Union Tel. Co.*, 337 F.2d 743, 745–46 (1st Cir.1964). The First Circuit construed the

---

**29.** We note that the Supreme Court's language refers to the then Rule 50(b) requirement for motion for judgment n.o.v. to be made within ten days after the *verdict;* in 1963 Rule 50(b) was amended in this respect, so that motions for judgment n.o.v. could be made "[n]ot later than 10 days *after entry of judgment"* (emphasis added). This conformed the time for n.o.v. motions to that for motions for new trial.

above-quoted language of *Johnson* respecting the "trial judge" to refer only to situations where, by the passage of time without a motion for judgment n.o.v., it was no longer possible for such a judgment to be entered. The First Circuit stated that where a timely motion for judgment n.o.v. could still be filed, the trial court

> "could have asked the defendant to file an immediate Rule 50(b) motion, and have acted upon it. To say that it could not, instead, act on the [defendant's] reserved pre-verdict motion [for directed verdict] would be to insist upon form over substance." *First Safe Deposit National Bank,* 337 F.2d at 746.

We believe these remarks are fully applicable to the case at bar. Moreover, were we to reverse the district court because it entered judgment for Cruse, when Cruse had not filed a motion for judgment n.o.v., and if the district court were to thereafter for the first time enter judgment against Cruse,[30] Cruse could within ten days thereafter file a timely motion for judgment n.o.v.,[31] which the district court, consistently with its prior action and our opinion on the merits herein, would presumably grant.

This strikes us as a wholly useless exercise.[32]

We conclude that, in the present circumstances, the rule of *Johnson* is inapplicable and that Cruse's failure to file a motion for judgment n.o.v. did not prevent the district court from granting Cruse's motion for directed verdict on which decision had previously been reserved. Such a conclusion, we believe, finds support by analogy in our several recent decisions dealing with motions for directed verdict, which have, under limited, exceptional circumstances, excused purely "technical noncompliance with Rule 50(b)" and admonished against "slavish adherence to the [Rule's] procedural sequence." *Bohrer v. Hanes Corp.,* 715 F.2d 213, 217 (5th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984); *Villanueva v. McInnis,* 723 F.2d 414, 417 (5th Cir.1984); *Merwine v. Board of Trustees for State Institutions,* 754 F.2d 631, 634 (5th Cir.1985). We accordingly reject Nichols' argument that Cruse's failure to have filed a motion for judgment n.o.v. prevented the district court from rendering judgment for it after the verdict.[33]

**30.** *Cf. Harrell v. Dixon Bay Transportation Company,* 718 F.2d 123, 126–29 (5th Cir.1983).

**31.** Such a scenario could not have occurred prior to the 1963 amendment (*see* note 29, *supra*), as under the "old" Rule the motion would be untimely since more than ten days would have elapsed from the verdict.

**32.** We mention another feature of this case which differs from *Johnson* in possibly material respects. In *Johnson,* no party filed a motion for judgment n.o.v. Here, Cessna and Garrett did, and Cessna's motion was directed, *inter alia,* to the jury's answer to the first interrogatory, which submitted the redhibition claim which Nichols made against Cessna and Cruse. As to this claim, Cruse was entitled to indemnity from Cessna. *See* note 10, *supra.* The district court (properly, we have held) granted Cessna's motion (and Garrett's), and did so on grounds which would exonerate Cruse. We have held that where a third-party defendant is cast in judgment for indemnity to the main defendant, and the third-party defendant successfully appeals on a ground which also exonerates the main defendant, such appeal enures to the benefit of the main defendant despite its failure to appeal. *See Kicklighter v. Nails by Jannee, Inc.,* 616 F.2d 734, 742–45 (5th Cir.1980). It is not

such a big step from that holding to one in the instant case that the ruling on Cessna's motion for judgment n.o.v. properly enured to Cruse's benefit.

**33.** We do not regard our decision in *Jennings v. Patterson,* 488 F.2d 436 (5th Cir.1974), as requiring a contrary result. There we said, in reversing the district court's judgment n.o.v. for defendants:

> "The defendants filed no motion for judgment n.o.v. In the absence of a timely motion, *normally* a district court may not grant judgment notwithstanding the verdict. Johnson v. New York, N.H. & H.R.R., 344 U.S. 48, 50, 73 S.Ct. 125 [126], 97 L.Ed. 77 (1952); *see* F.R.Civ.P. 50(b). In any event, there is ample evidence from which the jury could have found as it did—despite significant evidence supporting defendants' contentions." *Id.* at 440 (emphasis added).

We note that the procedural point does not appear to have been the ground of decision in *Jennings,* which (as the opinion as a whole makes clear) rather rested on the fact that the evidence was sufficient to support the verdict. Moreover, *Jennings* does not disclose whether motions for directed verdict were even made

## Conclusion

For the foregoing reasons the judgment of the district court is affirmed.

AFFIRMED.

---

and, if made, whether ruling thereon was expressly deferred, as here; and *Jennings* does suggest that *no* motions for judgment n.o.v. were filed, unlike the present case (*see* note 32,

*supra* ). Finally, *Jennings'* use of the word "normally" implies that this Court did not intend to foreclose the possibility of exceptions.