939 F.2d 1149
 The GENMOORA CORPORATION, Plaintiff-Appellee,
v.
MOORE BUSINESS FORMS, INC., Defendant-Third Party Plaintiff-Appellant,
v.
Joseph T. VERDESCA, Sr., William C. Jackson, Jr. and Steve
Pert, Third Party Defendants-Appellees.
 No. 89-1632.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 19, 1991.
On Petition for Rehearing and Petition
to Clarify Mandate
Sept. 30, 1991.
 As Modified on Petition to Further
Clarify Mandate; Mandate Recalled
Oct. 17, 1991.
 
 Robert E. Goodfriend, Dallas, Tex., for Moore Business Forms, Inc.
 Stephen W. Shoultz, Dallas, Tex., for Genmoora Corp., Verdesca, Jackson and Pert.
 Mike A. Hatchell, Tyler, Tex., Russell H. McMains, William V. Dorsaneo, III, Corpus Christi, Tex., for Genmoora Corp.
 Appeal from the United States District Court for the Northern District of Texas.
 Before CLARK, Chief Judge, REAVLEY and KING, Circuit Judges.
 KING, Circuit Judge:
 
 
 1
 In this dispute over the sale of a chain of retail computer stores, the buyer agreed to pay $6 million in cash, deposit $1 million in an escrow account, and pay $2 million subsequent to the closing (the "Deferred Amount"). The payment of the Deferred Amount and the escrow account were subject to a price adjustment based on an audited financial statement to be prepared after the closing by Touche Ross & Co. ("Touche Ross"). Touche Ross never completed the audit, but the Touche Ross preliminary figures showed a purchase price adjustment far exceeding the Deferred Amount. For this reason, the buyer refused to pay the Deferred Amount, and the seller sued. In response to a special interrogatory, the jury found that the purchase price should be adjusted downward by $975,000, and the court entered judgment in favor of the seller for $1,025,000 (the $2 million Deferred Amount minus the $975,000 purchase price adjustment found by the jury). The buyer contends on appeal that the jury's response to the special interrogatory on the amount of the purchase price adjustment was not supported by substantial evidence and that the district court therefore erred in not granting its motion for judgment notwithstanding the verdict. We agree that the evidence on the purchase price adjustment was not sufficient to establish liability, and we therefore reverse the judgment of the district court and remand with instructions to enter a take nothing judgment against the seller.
 
 I. BACKGROUND
 
 2
 The seller, the plaintiff-appellee, The Genmoora Corporation ("Genmoora"),[1] owned and operated approximately 43 retail computer stores. Genmoora began its operations on December 13, 1983, when it purchased these stores from a division of Xerox. During its brief operating history, Genmoora consistently lost money, and on July 16, 1984, the defendant-appellant Moore Business Forms, Inc. ("Moore"), a major manufacturer and retailer of business supplies and equipment, agreed to purchase all of Genmoora's assets and to assume substantially all of Genmoora's liabilities. Because Genmoora did not have any audited financial statements, the parties based the purchase price on an unaudited balance sheet as of May 31, 1984, and statements of profit and loss and changes in financial position for the three months then ended, which Genmoora warranted as accurate.
 
 
 3
 Moore agreed to pay up to $9 million for Genmoora--$6 million in cash, $1 million to be placed in an escrow account (to satisfy claims against Genmoora that might arise within a year of the closing), and a $2 million Deferred Amount to be paid on December 15, 1984. The parties agreed to make the payment of the funds placed in escrow and the Deferred Amount subject to a final purchase price adjustment calculated according to a formula provided in the Asset Purchase Agreement ("Agreement") and modified in an amendment executed at the closing (the "Amendment"). This formula required a mutually agreeable auditor, Touche Ross, to verify Genmoora's assets and liabilities as of July 31, 1984, the closing date.[2] By the end of 1984, Touche Ross had not been able to complete the audit.[3] Touche Ross, however, presented preliminary audit results on January 16, 1985, at a meeting between representatives of Moore, Genmoora, and Touche Ross. Those preliminary results showed a purchase price reduction of as much as $9.9 million, far in excess of the $2 million Deferred Amount and $1 million escrow account. See Chart A infra. Moore therefore refused to pay the Deferred Amount, and after an aborted attempt to settle the dispute, Genmoora filed suit to recover the balance of the purchase price. Genmoora alleged breach of contract, based on Moore's failure to pay the Deferred Amount, and fraud. Moore countersued to recover the monies paid to Genmoora, and added claims against Verdesca, Jackson and Pert, officers of Genmoora who had warranted the accuracy of the May 31, 1984 financial statements.[4]
 
 
 4
 In response to a special interrogatory, the jury found that the purchase price should be adjusted downward by $975,000.[6] The district court entered judgment, awarding Genmoora title to the balance in the $1 million escrow fund, and $1.025 million of the $2 million Deferred Amount ($2 million minus the $975,000 purchase price adjustment found by the jury).[7] The court also awarded Genmoora $600,000 in attorneys' fees for trial and $50,000 for appeal. The district court denied Moore's motions for judgment, for a new trial, and for judgment notwithstanding the verdict.
 
 
 5
 On appeal, Moore contends, inter alia, that the district court erred in denying its motion for judgment notwithstanding the verdict, and abused its discretion in denying its motion for a new trial. Moore argues that Genmoora failed to carry its burden of establishing that the purchase price should be adjusted downward by less than $3 million (the $2 million Deferred Amount plus the $1 million placed in escrow).[8] Without proof that the purchase price should be adjusted downward by less than $3 million, Moore argues, Genmoora did not prove that Moore breached its contract by failing to pay the Deferred Amount, or that Genmoora suffered any damages as a result of Moore's failure to pay the Deferred Amount.
 
 II. ANALYSIS
 
 6
 The parties based the initial purchase price on the May 31, 1984 unaudited balance sheet, but they agreed to cause Touche Ross "to prepare an audited balance sheet and related statements of income and retained earnings and changes in financial position as of the Closing Date," and they provided for an adjustment to the final purchase price based on the results of that audit. The May 31, 1984 unaudited balance sheet showed that Genmoora's current liabilities exceeded its current assets by $1.6 million. In addition, Genmoora forecast that it would lose another $1 million during the two months between May 31, 1984, the date of the unaudited financial statement, and July 31, 1984, the date set for closing. The purchase price adjustment formula provided that if the Touche Ross audited financial statements showed that Genmoora's current liabilities as of July 31, 1984 exceeded current assets by more than $2.6 million (the $1.6 million from the May 31, 1984 statement plus the $1 million forecast to be lost), Moore's final payment would be reduced proportionately. If liabilities exceeded assets by less than $1.6 million (the amount shown on the May 31, 1984 financial statement), Moore would make a larger final payment. In addition, the parties agreed to several exceptions from the purchase price adjustment calculation.
 
 
 7
 At trial, Moore argued that Genmoora was not entitled to a final payment or to the funds in the escrow account because the purchase price adjustment far exceeded the $2 million Deferred Amount and the $1 million escrow account. In support of this argument, Moore submitted the Touche Ross preliminary audit results, from which a downward purchase price adjustment can be calculated of as much as $9.9 million. See Chart A in Section I supra. Moore also presented the testimony of George Banks from the accounting firm of Grant Thornton. Banks testified that his firm spent more than 4500 hours and incurred $360,000 in auditing fees in an attempt to do essentially what Touche Ross had been unable to do, i.e., prepare audited financial statements for Genmoora as of July 31, 1984. Although Grant Thornton met with no greater success than had Touche Ross, Banks opined that the purchase price reduction should be somewhere between $7.888 million and $9.625 million. Genmoora's evidence on the amount of the purchase price adjustment consisted almost entirely of the testimony of its Chief Financial Officer and third-party defendant Steve Pert. Pert testified that the Touche Ross preliminary results contained various inaccuracies, and he volunteered that a purchase price reduction of between $600,000 to $800,000 would be "fair and equitable."[9]
 
 A. Pert's qualifications
 
 8
 Moore first argues that the district court erred by admitting Pert's testimony on the purchase price adjustment. Genmoora did not list Pert as an expert witness in its initial response to the district court's scheduling order. Genmoora later listed Pert, but only as a rebuttal expert who
 
 
 9
 may testify as to errors in the Grant Thornton work in the areas of fixed assets, inventory and accounts receivable. Mr. Pert may also testify as to errors in Dan Fischer's[10] May 31 and July 31 inventory analyses.
 
 
 10
 This response did not reveal that Pert would offer his own expert opinion as to the amount of the purchase price adjustment. Furthermore, at his deposition, Pert specifically stated that he did not "intend to testify on the July 31 inventory." Pert's testimony concerning the amount of the purchase price adjustment, however, consisted largely of disputing the results of the July 31 inventory, although he addressed certain other balance sheet items as well.
 
 
 11
 During direct examination, Genmoora asked Pert whether he did anything personally "to investigate the allocation of that [the Xerox] purchase price [for the FASB 38 adjustment]."[11] Moore objected that Pert was "getting into an area where he has not been designated as an expert." The record then indicates a bench conference, but does not disclose the substance of that conference, nor does it reveal a ruling on Moore's objection. Genmoora's counsel then asked Pert to detail his disagreements with the Touche Ross listing of accounting adjustments to the July 31, 1984 unaudited balance sheet. The parties apparently had a subsequent bench conference, but neither an objection nor a ruling appears in the record.
 
 
 12
 When Genmoora's counsel asked Pert whether he made "any sort of projections based upon FASB 28 [sic] in review of these Touche Ross preliminary numbers," Moore objected that Pert was "getting beyond--he is getting beyond the scope we discussed at the bench." The record indicates that the trial judge overruled this objection, but it does not disclose the basis for this ruling. Genmoora's counsel then asked Pert a series of questions about FASB 38 and how it affected the Touche Ross adjustments. After responding to these questions, Pert volunteered that $600,000 to $800,000 "would be a fair and equitable price adjustment." A few minutes after Pert gave his opinion concerning the amount of the purchase price adjustment, Moore moved to strike Pert's testimony.
 
 
 13
 Mr. Lynn [for Moore]: Your Honor, I understand it is a matter that has been taken up with the Court and the Court allowed this witness to go into matters pertaining to 190 JJ.[12]
 
 
 14
 The Court: Correct.
 
 
 15
 Mr. Lynn: And I don't mean to reargue that point at all with the Court but what happened during the course of that last testimony is the testimony slipped in which did not relate to 190 JJ and that was to the purchase price adjustment.... That goes beyond what 190 JJ had anything to do with.
 
 
 16
 Mr. Shoultz [for Genmoora]: Judge, ... what 190 JJ did was this. Started with the working capital figure which was predicated upon the purchase price adjustment.... 190 JJ was the first preliminary run that dealt with preliminary adjustments and used a starting point of the unadjusted figures. All we did was go down and rebut those and show what the purchase price adjustment would have come out to under that scenario. It was our rebuttal to 190 JJ.
 
 
 17
 Mr. Lynn: Excuse me, Your Honor. 190 JJ does not say anything about the purchase price adjustment issue.
 
 
 18
 The Court: Well, in any event I'm not going to strike the witness' testimony. However, I would advise you that once I have ruled that the testimony is coming in if it is coming in outside of the perimeters I set upon it please make your objection at the time it is coming in.
 
 
 19
 Moore argues that Pert's testimony concerning the amount of the purchase price adjustment, after Genmoora failed to list Pert as an expert on that subject, amounted to trial by ambush.[13] Although Genmoora's discovery responses may have been misleading, Moore did not preserve any error in admitting Pert's testimony because Moore failed properly to object to that testimony at trial or to obtain a proper ruling on the record on its objection. Fed.R.Evid. 103; Jenkins v. General Motors Corp., 446 F.2d 377, 383 (5th Cir.) (party must make a specific, timely objection and obtain a ruling on that objection on the record), cert. denied, 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1971); United States v. Jackson, 485 F.2d 300, 303 (7th Cir.1973) (unrecorded complaints, arguments, and rulings do not preserve error). We can surmise from Moore's motion to strike that the district court limited Pert's testimony to rebutting exhibit DX 190 JJ. Moore's specific objection to Pert's testimony, however, and the substance of the court's ruling on that objection, do not appear in the record. Without a specific objection and a ruling on the record, we are unable properly to evaluate the trial court's exercise of discretion.[14]
 
 
 20
 Moore also contends that the district court's decision to admit Pert's testimony was prejudicial and inconsistent with substantial justice because it deprived Moore of the opportunity to conduct meaningful discovery and prevented Moore from conducting meaningful cross-examination at trial. A new trial may be ordered when the testimony of an expert witness, who has not been identified prior to trial, results in prejudicial surprise "inconsistent with substantial justice." Conway v. Chemical Leaman Tank Lines, Inc., 687 F.2d 108, 111-12 (5th Cir.1982). We have "limited reversible error from unfair surprise," however, "to situations where a completely new issue is suddenly raised or a previously unidentified expert witness is suddenly called to testify." Id. at 112. Moore fails to meet this stringent test.
 
 
 21
 Genmoora designated Pert to testify on aspects of "fixed assets, inventory, and accounts receivable," all of which were relevant (directly or indirectly) to determining the amount of the purchase price adjustment. Genmoora designated no other witness to testify on the amount of the purchase price adjustment, a critical issue in the case, and Moore must have anticipated that Pert's testimony would be directed to this issue. Although Genmoora's discovery responses may have been misleading, we cannot conclude that Moore was the victim of prejudicial surprise of such magnitude that the admission of Pert's testimony was inconsistent with substantial justice. Shelak v. White Motor Co., 581 F.2d 1155, 1160 (5th Cir.1978). The district court has broad discretion to admit expert testimony, and in view of the state of the record, we conclude that the district court's decision not to strike Pert's testimony was not manifestly erroneous. Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962) (a trial judge "has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous").
 
 B. Pert's testimony
 
 22
 Even if Pert's testimony was properly admitted, Moore contends that Pert's testimony was insufficient on its face to support a jury finding of a purchase price adjustment of less than $3 million. In determining whether a motion for a directed verdict or judgment notwithstanding the verdict should have been granted,
 
 
 23
 the court should consider all of the evidence--not just that evidence which supports the non-mover's case--but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.
 
 
 24
 Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc); International Therapeutics, Inc. v. McGraw-Edison Co., 721 F.2d 488, 491 (5th Cir.1983) (reversing and rendering because of insufficient evidence).
 
 
 25
 An expert's testimony will not support a verdict if it lacks an adequate foundation in the facts of the case. See Nichols Constr. Corp. v. Cessna Aircraft Co., 808 F.2d 340, 351 (5th Cir.1985) (expert's opinion not a sufficient basis for jury's verdict when it lacks adequate foundation and merely instructs jury what result to reach) (quoting Matthews v. Ashland Chem., Inc., 770 F.2d 1303, 1311 (5th Cir.1985)); Texas Commercial Business Sys., Inc. v. F.C.C., 898 F.2d 460, 461 (5th Cir.1990) (expert witness's testimony on causation not sufficient to sustain jury verdict when not tied to the facts of the case); In re Air Crash Disaster at New Orleans, La., 795 F.2d 1230, 1235 (5th Cir.1986) ("An award for damages 'cannot stand when the only evidence to support it is speculative or purely conjectural.' ") (quoting Marks v. Pan Amer. World Airways, Inc., 785 F.2d 539, 542 (5th Cir.1986)).
 
 
 26
 The preliminary figures prepared by Touche Ross included an unadjusted balance sheet based entirely on Genmoora's records, and a list of adjustments to that balance sheet. The unadjusted balance sheet showed an excess of current liabilities over current assets (or a working capital deficit) of $9.236 million. See Chart B infra. The summary page for the Touche Ross proposed adjustments showed that working capital should be reduced by an additional $6.882 million. See Chart C infra. Together, the Touche Ross preliminary figures indicated an excess of current liabilities over current assets of more than $16.118 million, far in excess of the $2.6 million that the parties had predicted. See Chart A in Section I supra. In order to calculate the purchase price adjustment from the Touche Ross preliminary results, one must subtract the $2.6 million deficit that the parties had predicted, and certain "special contract items." Id.
 
 
 27
 CHART B
 JULY 31, 1984 UNADJUSTED BALANCE SHEET[15]
Total Current Assets ............... 19,281,664
Total Current Liabilities .......... 28,517,200
 ------------------
Difference ......................... -9,235,536
 
 
 28
 Genmoora's evidence concerning the amount of the purchase price adjustment consisted largely of the testimony of Steve Pert, Genmoora's Chief Financial Officer. Judging by the pretrial order, and to some extent by what happened at trial, Genmoora did not plan to ask Pert to provide his independent analysis of what the purchase price adjustment should be. Rather, Pert attempted to discredit some of the Touche Ross proposed adjustments, and then, using the unadjusted balance sheet as the starting point, to suggest special contract deductions that might reduce the purchase price adjustment to under $3 million dollars. In essence, Pert's testimony consists of a series of explanations concerning why he believed that he could convince Touche Ross that certain adjustments were inaccurate. He offered a confused jumble of errors that he stated that he found in the Touche Ross adjustments, errors that he hoped to find, and explanations for the Touche Ross adjustments that he admitted were proper. Finally, Pert volunteered that a "fair and equitable" purchase price adjustment would be between $600,000 and $800,000.
 
 
 29
 The extent of Pert's dispute with many of the specific items in the Touche Ross proposed adjustments cannot be discerned with certainty from his testimony. Pert stated, however, that he could have resolved $1.8 million in Touche Ross possible reclassifications, and he stated that he found $850,000 in inventory errors. Pert also suggested that the purchase price should be reduced by another $700,000 because of the reclassification of current assets to long-term assets, a special contract item. In addition, Pert stated that the purchase price should be reduced by $144,000 because of an agreement between Moore and Genmoora to split attorneys' and accountants' fees for the purchase of Genmoora (this would be another special contract item).
 
 
 30
 At this point in his testimony, Pert indicated that he had reduced the Touche Ross $6.882 million proposed adjustment to working capital to $3.3 million. If added to the excess of current liabilities over current assets of $9.236 million on the unadjusted balance sheet, the Touche Ross figures still showed an excess of current liabilities over current assets of $12.536 million, far in excess of the $2.6 million allowed by the purchase price adjustment formula. In order to reduce this figure still farther, Pert suggested two extremely speculative adjustments to the Touche Ross preliminary figures. First, he stated that, had he done the work, he might have found an additional $3.2 million in errors in receivables; and second, he stated that perhaps an additional $1.7 million dollars should be deducted on the basis of FASB 38 as a special contract item.[18]
 
 
 31
 With these additional adjustments, the excess of current liabilities over current assets would be $7.636 million. After deducting the permitted $2.6 million from this figure, the purchase price adjustment is approximately $5.258 million, still far in excess of the $3 million adjustment that Genmoora had to establish. Finally, Pert stated that a purchase price adjustment of between $600,000 and $800,000 would be "fair and equitable." Pert does not explain, however, how he arrived at this figure based on the errors that he purportedly found in the Touche Ross proposed adjustments.
 
 
 32
 CHART D
 PERT'S PURCHASE PRICE ADJUSTMENT FIGURES
Current Assets from Unadjusted Balance Sheet ........ 19,281,664
Current Liabilities from Unadjusted Balance Sheet ... -28,517,200
Difference .......................................... -9,235,536
Touche Ross Adjustments to Working Capital .......... -6,882,000
Total Difference .................................... -16,117,536
Adjustments to Possible Reclassifications ........... 1,800,000
Errors in Approved Adjustments to Inventory ......... 850,000
Reclassification of Short Term to Long Term Assets .. 700,000
Errors in Approved Adjustments to Receivables ....... 3,200,000
FASB 38 Reallocation ................................ 1,700,000
Predicted Loss Permitted by Contract
Purchase Price Adjustment ........................... 5,257,836[19]
 
 
 33
 Even if a purchase price adjustment of between $600,000 and $800,000 can be derived from Pert's testimony and the exhibits, which is not at all certain, see note 5 supra, at least two of the numbers that Pert explicitly used lacked any foundation, as Pert's testimony clearly reveals. After attempting to rationalize why the Touche Ross "approved adjustment" figure should be reduced from $6.88 million to $3.3 million, Pert was asked by Genmoora's attorney to describe what further analysis he made of the Touche Ross proposed adjustments.
 
 
 34
 Q. Okay. Let me ask you this. From the three point three million dollar figure that we are at right now, what did you do in relation to [the Touche Ross proposed adjustments]?
 
 
 35
 A. Well, what I was looking at was inventory. That is really the only area that I have really gotten down to a transaction by transaction look and given that I had found eight hundred thousand dollars in between the first run and the second and then another eight hundred fifty thousand dollars in the second run. What my plan was to go back and look at the receivables and some of the other areas and I was pretty confident that I was going to find some of the same kinds of adjustments.
 
 
 36
 Pert testified that Genmoora's experience with returns and bad debts was very small, and although he
 
 
 37
 didn't have the detailed transactions to refute and show Touche that I was confident if I found a million six in the inventory I was pretty confident I would find a pretty substantial number in the receivables.
 
 
 38
 Q. Did you make any projections on that based upon the work that you did not review?
 
 
 39
 A. I believe we did.
 
 
 40
 Q. And what was that projection?
 
 
 41
 A. We felt that we would probably find in all areas something in the order of three point two million.
 
 
 42
 In other words, Pert testified that he was "pretty confident" that he "was going to" find or "would probably find" additional adjustments that he "projected" would be "in the order of" another $3.2 million. Pert did not testify that he found such errors, or even that he had done the work necessary to ascertain if such errors existed. In such circumstances, the $3.2 million figure was a pure guess.
 
 
 43
 Pert, however, characterized this adjustment to receivables as an "extrapolation" based on the errors that he found in inventory. Although auditors frequently extrapolate from samples, a sampling from inventory would not support an adjustment to receivables. Genmoora also observes that owners may speculate as to value "so long as the assumptions rest on adequate data." Lehrman v. Gulf Oil Corp., 500 F.2d 659, 668 (5th Cir.1974), cert. denied, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975). Even if the testimony of a corporation's Chief Financial Officer can be considered the testimony of an owner, which is doubtful, the testimony still must be based on adequate data. Pert's $3.2 million error in the Touche Ross proposed adjustment to receivables was not based on any data.
 
 
 44
 Genmoora also observes that neither Touche Ross nor Grant Thornton could prepare an audited July 31, 1984 financial statement, and Genmoora argues that Pert had to prove the purchase price adjustment only with that degree of certainty to which the case was susceptible. The adjustment to receivables, however, was susceptible of far better proof than Pert offered. Genmoora had four years to obtain the documents Pert needed to prepare for trial. Pert, of course, could not prepare an audited financial statement, but Pert failed even to make a cursory examination of receivables before testifying to a $3.2 million adjustment. Preparation for this trial may well have been difficult, but Genmoora had the obligation to present better evidence than a guess.
 
 
 45
 Pert's $1.7 million reallocation based on FASB 38 also lacks an adequate foundation. Pert not only admitted that his FASB 38 reallocation is guesswork, he also admitted that someone else made the guess.[20] When asked about the FASB reallocation on direct examination, Pert testified:
 
 
 46
 Q. All right. Now did you at all make any sort of projections based upon FASB 28 [sic] in review of these Touche Ross preliminary numbers on 63?
 
 
 47
 * * * * * *
 
 
 48
 A. Yes ... we didn't have the books or the records to determine it exactly but we felt that it was probably at least a million and could be as high as three million. I think we used a million seven more as a probable number but we didn't have the records by which to calculate it exactly.
 
 
 49
 Q. So you allocated a million seven according to FASB 38?
 
 
 50
 A. That is correct.
 
 
 51
 On cross-examination, Pert conceded that the range in which the adjustment could have fallen was even larger, from $500,000 to $3,500,000.
 
 
 52
 Q. Now, in fact you never really reached the determination as to how much that amount should be? Your testimony yesterday I believe it would be between one million and three million?
 
 
 53
 A. That is correct.
 
 
 54
 * * * * * *
 
 
 55
 Q. And what you are saying is when you got over here to December 31 [1984] as a result of all the information you had available you think now that this initial inventory was valued improperly?
 
 
 56
 A. No, we don't know. We don't have records to do that analysis.
 
 
 57
 * * * * * *
 
 
 58
 Q. Mr. Pert, what is the source of the one point seven million dollar figure that you come up with?
 
 
 59
 A. That was an estimate by Bill Jackson. Without the records we didn't have the precise number.
 
 
 60
 Q. I am asking you what it is an estimate of, Mr. Pert. Is it the estimate of the amount by which the inventory of July 31 was overvalued?
 
 
 61
 A. No, it was an estimate on the potential overvalue of the inventory as of December 13th, 1983.
 
 
 62
 Q. One to three million dollars?
 
 
 63
 A. It could have been five hundred thousand. It could have been three million. It could have been three and one-half million. We didn't have the records at that time to do an analysis.
 
 
 64
 Still later Pert changed his testimony yet again, indicating that the $1.7 million figure "was an estimate that could be wrong by as much as seven hundred thousand in either direction." Finally, during his rebuttal testimony, Pert conceded that the $1.7 million figure was nothing more than a "pure estimate," and that he didn't know if the estimate was correct.
 
 
 65
 Furthermore, in order for FASB 38 to apply, a preacquisition contingency must exist that results in an error in the initial valuation of the acquired assets. An error in the initial valuation in the inventory, therefore, was a factual predicate essential to Pert's use of FASB 38. Pert, in fact, agreed with the Touche Ross partner, Don Wagner, that FASB 38 could be applied in the instant case only if the inventory acquired by Genmoora from the Xerox Corporation in December of 1983 was overvalued on its opening balance sheet. Pert testified:
 
 
 66
 Q. ... Now if in fact the inventory in December 1983 was properly valued the FASB 38 allocation issue isn't available to you, is it?
 
 
 67
 * * * * * *
 
 
 68
 A. If it was fairly valued, that is correct.
 
 
 69
 Nevertheless, Pert testified that he had "no indication prior to [the closing date] of August 16" that Genmoora was "selling that product at less than the price we had it on our books,"[21] and Pert represented (in financial statements and elsewhere) that the inventory values were correct.[22] In addition, Touche Ross's independent assessment indicated that Genmoora had adequate reserves for obsolescence as of December 13, 1983.[23]
 
 
 70
 Pert, in fact, conceded on cross examination that he had no evidence that the initial inventory allocation was wrong, and Don Wagner, the Touche Ross partner responsible for the Genmoora audit work, testified that Pert never produced "one iota of evidence" to him that the initial inventory value was incorrect.[24] On cross examination, Pert stated:
 
 
 71
 Q. I apologize, Mr. Pert. My question is very clear. Do you have any evidence today, to this day, that the initial allocation was wrong?
 
 
 72
 A. No.
 
 
 73
 Again, asked about a previous statement on the subject made in his deposition, Pert testified:
 
 
 74
 Q. Also in your deposition did I ask you the question
 
 
 75
 "To this date, sir, today October 7, 1986 do you have any reason to believe that those initial reserves for that inventory that was initially purchased from Xerox were not accurate?"
 
 
 76
 Did I ask you that question and did you give the answer?
 
 
 77
 "I have no information. I have no reliable information to indicate that they weren't accurate."
 
 
 78
 A. That was true that day and true today.
 
 
 79
 In addition, Pert specifically stated that he did not arrive at the $1.7 million figure himself. He testified that the $1.7 million figure was "an estimate" provided by the third party defendant William Jackson. Jackson, however, stated that "he was basically not in the group" that discussed the FASB issue, and specifically denied ever having any discussions with anyone (including Pert) about obsolete Xerox inventory in any dollar amount. In Nichols Construction Corp. v. Cessna Aircraft Co., 808 F.2d 340 (5th Cir.1985), we found an additional ground for upholding the trial court's grant of judgment notwithstanding the verdict because the plaintiff's expert on the cause of the air crash did not come to his conclusion through application of his own expertise and analysis as much as he relied upon the impressions and opinions of others. Id. at 350-51.
 
 
 80
 Genmoora could not merely rebut Moore's evidence concerning the amount of the purchase price adjustment. It had to create a conflict in substantial evidence from which the jury could conclude that the purchase price adjustment should be less than $3 million. An expert's testimony is not substantial if it is based merely on speculation and conjecture without basis in fact. Nichols Constr. Corp., 808 F.2d at 346 n. 14. Both the $3.2 million adjustment to receivables and the $1.7 million FASB 38 component of Pert's calculation of the purchase price adjustment were nothing more than unsupported speculation. Such testimony is insufficient to support the jury's verdict as a matter of law. Nichols Constr. Corp., 808 F.2d at 349 (5th Cir.1985) (in order to support a jury verdict, an expert's testimony must be based on more than unsupported assumptions); Marks v. Pan Amer. World Airways, Inc., 785 F.2d 539 (5th Cir.1986) (sustaining judgment notwithstanding the verdict when evidence of damages was too speculative and without persuasive evidence in the record); International Paper Co. v. United States, 227 F.2d 201, 205 (5th Cir.1955) (directed verdict upheld on the grounds of insufficient evidence, the court observing that an opinion by an expert witness is "no better than the hypotheses or assumptions upon which it is based"); In re Air Crash Disaster at New Orleans, La., 795 F.2d 1230, 1235 (5th Cir.1986).
 
 C. Alternative Paths to Affirmance
 
 81
 Genmoora contends with Moore's challenges to Pert's testimony by offering in its appellate brief three alternative routes to the result that the jury reached. The first route, entitled the "loss analysis," essentially uses an income (loss) method, focusing on the actual loss incurred during the two month period between the May 31, 1984 and July 31, 1984 balance sheets, and deducting a loss incurred prior to that period and the projected loss for that period. The fatal problem with that route is that it employs a method of computing the purchase price adjustment that bears no resemblance to the method called for by the Agreement, which the jury was properly instructed to use.
 
 
 82
 The second route, entitled the "unadjusted July 31 balance sheet," deducts from the unadjusted July 31 current liabilities first, the unadjusted July 31 current assets, second, a number of special contract items, and third, the predicted loss permitted by the Agreement. Although the special contract items contain record references, it is not possible to tie several of the numbers to the unadjusted financial statements. For example, a number ($1,990,000), entitled "Reclassification of Short Term to Long Term Assets," refers to Pert's testimony where the number $700,000 appears for the same category, and to balance sheets at May 31, 1984 and July 31, 1984 which reflect different numbers for current assets and current liabilities. The implication seems to be that the differences are accounted for principally by a reclassification of short term to long term assets. But of course, there is no way to tell what the differences that appear to have occurred during that two month period are attributable to. Nor is there any basis in the Agreement for deducting "pre-yardstick" period losses. See note 18 supra. In short, there is no basis on which we could conclude that the "unadjusted July 31 balance sheet" route is supported by substantial evidence in the record.
 
 
 83
 The third route, entitled the "Pert's Resolution of the Touche Ross Worst Case Scenario," deducts from the total approved and possible Touche Ross adjustments to July 31, 1984 balance sheet (see Chart C supra ) a number of items. Key is the $3,200,000 number that is described in Genmoora's brief as "partially proved Pert would have resolved," which we have shown to be pure speculation and unacceptable as a basis for the jury's verdict. See text following note 19. The third route, therefore, fails for the same reason as did Pert's testimony.
 
 
 84
 Finally, Genmoora also argues that the jury could have derived its purchase price adjustment figure from the testimony of witnesses other than Pert. We disagree. The brief references to the purchase price adjustment in the testimony of Brinker, Grayson, and Jackson consist either of testimony based on conversations with others, or conclusory and tentative estimates of what the purchase price adjustment might be. None of these witnesses personally performed any analysis regarding the size of the purchase price adjustment, and their brief references to the purchase price adjustment are far more tentative and speculative than even Pert's testimony.
 
 
 85
 In summary, the alternative paths to affirmance argued on appeal by Genmoora will not support the jury's finding on the amount of the purchase price adjustment.
 
 III. CONCLUSION
 
 86
 For the foregoing reasons, we reverse the district court's judgment in favor of Genmoora on its contract claim, and remand with instructions to enter a take nothing judgment against Genmoora. Because Genmoora will not recover on its contract claim, we also reverse the district court's award of attorneys' fees. Costs shall be borne by Genmoora.
 
 
 87
 REVERSED AND REMANDED.
 
 
 88
 ON PETITION FOR REHEARING AND PETITION TO CLARIFY MANDATE
 
 
 89
 Sept. 30, 1991.
 
 
 90
 Before CLARK, Chief Judge, REAVLEY and KING, Circuit Judges.
 
 PER CURIAM:
 
 91
 It is ORDERED that Genmoora's petition for rehearing is DENIED.
 
 
 92
 It is further ORDERED that Moore's petition for rehearing to clarify mandate is GRANTED. We are advised that the judgment of the district court has been partially executed and that Genmoora has taken title to $1 million in the escrow account. Genmoora did not execute the remainder of the judgment because Moore obtained a stay. The $1 million in the escrow account was, together with a $2 million Deferred Amount, the subject of the dispute in the district court. The panel opinion held that Genmoora was not entitled to any of the $3 million because it failed to present evidence from which the jury could conclude that the purchase price adjustment should be less than $3 million. Genmoora Corp. v. Moore Business Forms, 939 F.2d 1149, 1163 (5th Cir.1991). Our instruction on remand that the district court enter a take nothing judgment against Genmoora did not make explicit that Genmoora was not entitled to the funds in the escrow account. Accordingly, we reform the mandate to instruct the district court to enter a take nothing judgment against Genmoora and to enter a further order granting restitution to Moore of the value of all proceeds, government securities or other things delivered to Genmoora from the escrow account, together with interest thereon from the date the judgment was partially executed. The mandate shall issue forthwith.
 
 
 
 [1]
 The Genmoora Corporation is a successor name for the Genra Group, Incorporated. We use "Genmoora" throughout to refer to the plaintiff-appellee, whether its name at the time in question was Genra Group, Incorporated, or The Genmoora Corporation
 
 
 [2]
 The parties agreed to deem July 31, 1984 as the closing date for purposes of calculating the purchase price adjustment, although the sale was not actually closed until August 16, 1984
 
 
 [3]
 Each side accuses the other of making the audit impossible, but this issue was not submitted to the jury and no party appeals the decision of the district court not to submit it
 
 
 [4]
 Moore filed a second suit against certain directors and officers of Genmoora, as well as other parties, alleging that they looted Genmoora of its assets before Moore could obtain a judgment in this case. The district court stayed that action pending resolution of this litigation. In addition, Xerox Corporation, a Genmoora shareholder, filed a derivative suit against Genmoora's officers and directors, alleging that the same actions alleged in Moore's second suit violated Xerox's rights as a minority shareholder. The Xerox suit is pending and is subject to the prior opinion of this court. See Xerox Corp. v. Genmoora Corp., 888 F.2d 345 (5th Cir.1989)
 CHART A
 PURCHASE PRICE ADJUSTMENT FROM TOUCHE ROSS FIGURES
Current Assets From Unadjusted Balance Sheet ....... 19,281,664
Current Liabilities From Unadjusted Balance Sheet .. -28,517,200
Touche Ross Adjustments To Working Capital ......... -6,882,945
Predicted Loss Permitted By Contract ............... 2,609,700
Total Possible Purchase Price Adjustment ........... -13,508,781
Grant Thornton Amount For Special Contract Items ... -3,600,000[5]
Possible PPA Without Pert's Adjustments ............ -9,908,781
 
 
 [5]
 Steve Pert, Genmoora's Chief Financial Officer, testified concerning some, but not all, of these special contract items. He testified to $700,000 in reclassifications of short term assets to long term assets, $144,000 in acquisition costs, and $1,700,000 in an FASB 38 reclassification, or a total of $2,544,038 in special contract items. The Agreement mentions other items that must be deducted in order to calculate the purchase price adjustment, however, such as certain loans, but neither side introduced testimony concerning the amount of these deductions. There are certain exhibits that reflect items that may be deductible under the Agreement, but without testimony tying these items into the Agreement, it is not possible to arrive at a number representing a total of special contract items. George Banks, Moore's expert from Grant Thornton, provided the only other testimony concerning the amount of these special contract items. He did not break these items down, but testified that they amounted to a total of about $3.6 million. We use the number provided by Banks in this chart because only Banks provided a total for these special contract items
 
 
 [6]
 The judge's instructions on the competing breach of contract claims included the following:
 You are instructed that the entire amount of the purchase price is subject to the adjustment, if any. You are further instructed that neither the amount of the purchase price nor any adjustments to the purchase price are dependent upon the completion of a final audit by Touche Ross.
 Genmoora contends that the adjustment to the purchase price is $600,000 and therefore it is entitled to $2.4 million of the funds in the escrow account and the deferred amount, which Moore refuses to pay over to Genmoora. Genmoora claims, therefore, that Moore is in breach of the Asset Purchase Agreement, as amended, because it refused to pay over to Genmoora the amount to which it is entitled from the funds in the escrow account and the deferred amount.
 Moore contends that the downward adjustment of the purchase price, as calculated by the formula in the Asset Purchase Agreement, as amended, is a minimum of $7,888,000 and a maximum of $9,625,000 and so greatly exceeds the total amount in the escrow account and the deferred amount. Moore claims, therefore, that it is not in breach of the agreement since it is entitled to the amount in the escrow account and the deferred amount because the downward adjustment of the purchase price exceeds these funds, and further, that Genmoora is in breach of the Asset Purchase Agreement by refusing to repay Moore the amount of the downward adjustment of the purchase price that exceeds the total of the escrow account and the deferred amount.
 The district court then submitted the following special interrogatory:
 On this question, the burden of proof is on Plaintiff Genmoora to prove that the amount of the reduction to the purchase price of the assets of Genmoora is less than $3 million (the total of the amount in the escrow account and the deferred amount).
 Also, on this question, the burden of proof is on Defendant Moore to prove that the amount of the reduction is greater than $3 million (the total of the amount in the escrow account and the deferred amount).
 By applying the formula in the Asset Purchase Agreement, as amended, by what sum of money, if any, do you find by a preponderance of the evidence the purchase price is required to be reduced under the terms on the Asset Purchase Agreement, as amended.
 The jury responded with $975,000. We note that the instructions and special interrogatory were not objected to, and are not appealed.
 
 
 [7]
 In addition, the jury found that Genmoora breached its warranty concerning the accuracy of its May 31, 1984 financial statements, but the jury also found that Genmoora's breach of warranty was not the proximate cause of damage to Moore. The jury found against all parties on all other claims. None of these findings is appealed
 
 
 [8]
 Moore also asserts that the district court erred because the breach of warranty found by the jury amounted to a failure of a condition precedent to Moore's obligation to pay the Deferred Amount. Because of our disposition of Moore's insufficiency of the evidence claim, however, we do not reach Moore's condition precedent argument
 
 
 [9]
 The contract, however, did not call for a "fair and equitable" purchase price adjustment. Rather, it provided a specific formula for calculating the adjustment
 
 
 [10]
 Dan Fischer was the Vice-President and Comptroller of Moore's business products group
 
 
 [11]
 FASB 38 is a shorthand name for Statement of Financial Accounting Standards No. 38, one of the accounting rules comprising generally accepted accounting principles ("GAAP"). The Financial Accounting Standards Board ("FASB") issued FASB 38, which has the official title of "Accounting for Preacquisition Contingencies of Purchased Enterprises." FASB 38 provides that when a company purchases the assets of another company and some "preacquisition contingency" exists that makes the value of one of the acquired assets uncertain at the time of acquisition, the acquiring company subsequently may adjust the initial valuation of that asset if the contingency is resolved within a period not in excess of one year, known as the "allocation period." Pert asserted that the value of Genmoora's initial inventory acquired from Xerox may have been overvalued because of undiscovered obsolescence, and that this undiscovered obsolescence constituted a preacquisition contingency for purposes of FASB 38. According to some of Pert's testimony--but not all, see infra --FASB 38 may have allowed Touche Ross to reallocate a portion of the original price paid to Xerox from inventory principally to good will
 
 
 [12]
 190 JJ is an exhibit that contains the first run of Touche Ross's proposed adjustments to the unadjusted July 31, 1984 balance sheet
 
 
 [13]
 Moore also observes that Pert disclaimed being an expert in accounting. For example, Pert gave the following responses on cross-examination:
 Q. Mr. Pert, you'll agree that you're not an expert in accounting, will you?
 A. I'm not a paid expert.
 Q. Mr. Pert, you'll agree that, paid or not, you're not an expert in accounting, are you?
 A. I'm not sure what you mean by "expert."
 Q. Mr. Pert, during your deposition on October 7, 1986, did you not say: Well, again I'll go on as a CPA. I don't hold myself out as an expert in accounting?
 A. Yes, I did.
 Q. And did you not testify when we took your deposition as an expert witness in this case on the 4th and 5th of May, 1988, so in those areas that involve expert knowledge as an auditor or expert knowledge of financial accounting you agree that you're not qualified to testify as an expert in those areas and did you not answer "That's correct?"
 A. I did.
 
 
 [14]
 Moore failed to obtain a ruling on its first objection. It did obtain rulings on its second objection and on its motion to strike, but Moore's objections, and the rationale for the court's rulings, are intertwined with the unrecorded bench conferences. We therefore can only speculate and surmise concerning the basis for Moore's objections and the court's rulings
 
 
 [15]
 We base this chart on DX 63A
 CHART C
 TOUCHE ROSS ADJUSTMENTS TO JULY 31, 1984 BALANCE SHEET[16]
 SUMMARY PAGE
 Approved Possible Total
 Adjustments Adjustments Approved
 & Reclass.[17] & Reclass. & Possible
Total Assets ....... -2,794,556 ......... -685,257 ..... -3,479,813
Total Liabilities .. -1,408,922 ......... -1,652,586 ... -3,061,508
Working Capital .... -4,115,675 ......... -2,767,270 ... -6,882,945
 
 
 [16]
 We base this chart on DX 63B. Pert's testimony concerning the amount of the purchase price adjustment consisted of disputing some of these proposed adjustments
 
 
 [17]
 The Touche Ross preliminary numbers were divided into "approved adjustments," "proposed adjustments," and "proposed reclassifications." Tom Larsen, the Touche Ross audit manager, explained:
 The audit process causes certain adjustments to be proposed by the auditors. We review those adjustments with management; and ultimately if management agrees that those adjustments are proper, they're reflected in the adjusted financial statements.
 He indicated that he believed that management had approved the items in the "approved adjustments" column, although all adjustments were subject to further review and did not become final until the financials were issued. Pert, on the other hand, testified at trial that he approved only a portion of the "approved adjustments." "Proposed reclassifications," as opposed to "proposed adjustments," Larsen explained, "were those adjustments for which we did not have sufficient audit evidence to make a firm estimate of what the proper proposed adjustment should have been." Most of the errors that Pert states that he found were in the category of "proposed reclassifications."
 
 
 [18]
 Pert also explained that $500,000 in losses that appeared on the unaudited July 31, 1984 balance sheet were incurred in February of 1984 but were not booked until July of 1984. The $600,000 to $800,000 purchase price adjustment, Pert suggested, largely can be attributed to this $500,000 in losses that occurred in February but were not reflected on Genmoora's books until July. On appeal, Genmoora argues that this $500,000 should be deducted from the final purchase price because June and July were a "yardstick period" for calculating Genmoora's losses and the $500,000 was a "pre-yardstick" loss. The Agreement, however, provides no basis for concluding that June and July comprised a "yardstick" period, or for deducting "pre-yardstick" losses from the purchase price adjustment
 
 
 [19]
 Additional special contract items, to which Pert did not testify, see note 5 supra, might reduce the purchase price adjustment below $5,257,836
 
 
 [20]
 At first glance, such a FASB 38 reallocation would not appear to benefit Genmoora because it reduces the value of current assets and thus would appear to increase the amount of the purchase price adjustment. Genmoora relies, however, upon a portion of the Agreement that states that "reclassification of assets on the May 31 Financial Statements to non-current assets on the Closing Balance Sheet shall not affect the Purchase Price." Genmoora contends that FASB 38 permitted an adjustment to Touche Ross's preliminary figures on inventory but did not otherwise affect the purchase price. Moore contends that FASB 38 is inapplicable by its own terms, that the Agreement precluded the use of FASB 38, and that Pert's $1.7 million FASB 38 adjustment was too speculative to support the jury's verdict on the size of the purchase price adjustment
 Moore argues that the transfer of value from inventory to other assets was a revaluation of the inventory rather than a reclassification and that such a revaluation should affect the purchase price. Moore's distinction between reclassification and revaluation, although intuitively appealing and forcefully argued, is not supported by the language of the Amendment.
 
 
 [21]
 Genmoora argues that whether Pert had information about the Xerox inventory overvaluation "prior to August 16, 1984" is irrelevant because FASB 38 allowed one year from December 13, 1983 to resolve the contingency. We agree that the date that Pert learned of the overvaluation would not be significant if someone determined that such an overvaluation actually existed within a year of the purchase date. Genmoora failed to present a witness, however, willing to testify to more than a guess that such an overvaluation of inventory may have existed
 
 
 [22]
 Each of the unaudited Genmoora financial statements as of February 29, 1984 and May 31, 1984 was represented to Moore as fairly presenting the financial condition of Genmoora as of its date, which implicitly means that the inventory was fairly valued or fairly presented. The Agreement also contained a specific warranty that Genmoora's inventory was properly valued, and Pert represented to Joseph McArthur, just prior to the closing, that the inventory was correctly valued. Finally, Touche Ross was able to audit the Genmoora financial statements as of February 29, 1984, and gave a clean report on the inventory
 
 
 [23]
 Wagner testified that Touche Ross conducted its own independent evaluation of Genmoora's inventory and concluded that Genmoora's inventory reserves for obsolescence were more than adequate. According to Wagner, Genmoora's subsequent claim that the initial inventory was overvalued was contrary to this evaluation and to the representation Genmoora had made to Touche Ross about the value of that inventory in the management representation letter given to Touche Ross as part of the February 29 audit, see note 22 supra
 
 
 [24]
 Pert testified that he had "questions" and "suspicions" about the value of Genmoora's beginning inventory, but never actually testified that he determined that Genmoora's initial inventory was overvalued or the amount of any such overvaluation